[No. G026130. Fourth Dist., Div. Three. July 17, 2000.]

In re JASMINE G., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
DAPHNE S., Defendant and Appellant.

**COUNSEL**

Stephanie M. Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

Laurence M. Watson, County Counsel, and Mark R. Howe, Deputy County Counsel, for Plaintiff and Respondent.

Michael D. Randall, under appointment by the Court of Appeal, for Minor.

**OPINION**

**SILLS, P. J.—**

## I. INTRODUCTION

"Because we so abhor the involuntary separation of parent and child," wrote Justice Baxter for the court in *In re Kieshia E.* (1993) 6 Cal.4th 68, 76 [23 Cal.Rptr.2d 775, 859 P.2d 1290], "the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures." (*Ibid.*) Not surprisingly then, California law requires that there be no lesser alternative before a child may be removed from the home of his or her parent.[1]

In this case, a social worker opined that a teenager should not be returned to her mother because both her parents apparently lacked a "full understanding" of their 15-year-old daughter's adolescent "issues." Excuse us—but

---

[1]Section 361, subdivision (c)(1) of the Welfare and Institutions Code provides in pertinent part: "No dependent child shall be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated unless the juvenile court finds clear and convincing evidence of any of the following: [¶] (1) There is a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor or would be if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents' or guardians' physical custody."

All statutory references in this opinion are to the Welfare and Institutions Code. Current subdivision (c) of section 361 used to be subdivision (b). (See Stats. 1997, ch. 793, § 15 [adding new subd. (b) regarding voluntary relinquishment of a child].)

what parent *doesn't* that describe? A social worker's opinion that parents have not sufficiently internalized proper parenting skills is not substantial evidence to justify even a detriment finding (see *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1751 [53 Cal.Rptr.2d 687] [failure to internalize general parenting skills was insufficient evidence to support detriment finding at 18-month review]), much less removal under section 361. Because the trial court had no substantial evidence on which to predicate a finding of substantial danger to the daughter, we reverse the dispositional order.

And then there is the incident involving a nose stud—ironically acquired after detention—to which we fear the trial court accorded rather exaggerated significance. That incident is explained in its proper context below (in pt. III.B., *post*, of this opinion).

## II. FACTS

In late May 1999, then 15-year-old Jasmine was living with her mother, Daphne, in Tustin. Her father, Michael, lived in Fountain Valley. As a social worker's report would later note, both parents were employed, "law-abiding citizens" with no alcohol or drug dependencies and no prior encounters with the juvenile dependency system. Both parents explicitly shared the responsibility for rearing Jasmine, in terms of such things as curfew hours, when she could go out, and what sort of clothes she could wear.

On May 21, Daphne used a switch to discipline Jasmine for having invited a boy into the home in violation of house rules. Both parents considered the presence of a stranger in the home to be a serious, even "life-threatening" matter. Michael used a thin leather belt to strike Jasmine across the buttocks and on the upper back of the legs for the same incident. Daphne also used a switch two days later to discipline Jasmine for failing to wash the dishes.

These incidents left marks and prompted the county's social services agency to file a petition to declare Jasmine a dependent child and detain her at Orangewood Children's Home. Between the May 1999 detention and the commencement of the dispositional hearing in late August, Jasmine went from Orangewood to an unsatisfactory placement in a foster home, back to Orangewood, and then to two group homes. And she saw a therapist.

For their part, the parents also saw a therapist—privately paid for—and stipulated to jurisdiction based on a finding that they had "physically abused" their daughter. They also each completed a parenting course.

The dispositional hearing consisted of the testimony of six witnesses: the parents' private therapist, Jasmine herself, the social worker, mom, dad, and

Jasmine's therapist. Much of the record is preoccupied with household minutia: Jasmine must "earn" the ability to go out with her friends by getting good grades, but doesn't have to earn the right to watch television. She is expected to receive no "C's" on her report card, and no more than one or two "B's." Her mother lets her shave her legs. Jasmine's mother does not allow her to wear red nail polish, and her father does not allow her to wear "sparkly" nail polish. He thinks she should stick with pastels. Jasmine spends her weekends doing homework, and in her free time she goes swimming 15 days out of the month; she goes to school dances with her friends, basketball and football games, and she often goes to "the mall."

The important facts are these: Jasmine's mother, Daphne, and father, Michael, both testified that they had changed their attitudes toward corporal punishment for teenagers and expressed remorse that their physical abuse of their daughter had led to the dependency. Jasmine's therapist testified that Jasmine had no anger toward, or "fear" of, either parent. Jasmine herself testified that she wanted to go back to either her mother's or her father's house. Jasmine believed that her mother had "learned from this whole thing" and didn't believe her mother would "hit [her] again."[2] She also, however, testified that at various times she had been disciplined by Daphne "in anger" and had been "slapped" by her. The parent's therapist stated that Jasmine was in no "danger" if she were returned to one of the parents, and noted that the parents had each expressed remorse and had the "motivation to change their former forms of discipline."

The social worker, however, testified that she did not believe Jasmine should be returned because the "parents seem to lack understanding of their responsibility and their roles in the incident that brought [Jasmine] to social service agency's attention." As support for her assertion of lack of understanding, she mentioned the "mother's own statements" that "any time Jasmine adamantly defiles [sic: probably "defies"] their rules then she is given corporal punishment," and the mother's belief that Jasmine "was endangering her life by allowing a stranger in their home." The social worker mentioned the father's statement that "if he was going to spank her he should have started at an earlier age and not now" as expressive of the view "that he wasn't admitting to maybe he had made a mistake."

The social worker further complained about the parents' "lack of cooperativeness and the hostility that's been presented to [her]," and the fact the mother had written a note to Jasmine's physical education teacher after having used a switch on her to the effect that she had rashes. She followed

---

[2]It also turned out that Daphne had herself *taught* a parenting class when she managed a home for abused children in the late 1980's.

that with the comment, to which we have alluded above, that the "parent's don't have a full understanding of Jasmine's issues as a 15-year-old child and have really isolated her and protected her in that she is having difficulties dealing with adolescent issues." The social worker was also opposed to returning Jasmine to her father's home because of undisclosed "difficulties" between her father and his wife.[3]

Jasmine's own therapist, having never talked to the parents, was "hesitant" about making a recommendation as to whether Jasmine should be returned home. She did, however, say that she "would like to see some sessions" prior to any return, so that the there would be "some very clear and sane guidelines about what is expected of Jasmine. And also some clear idea about what's going to happen if she didn't comply."

During the hearing, the trial court itself asked some questions centering on the parents' philosophy of child rearing. The court asked the parents' therapist if she ever discussed their "child raising philosophy," to which the therapist replied that they "have a certain amount of rigidity in terms of right and wrong," having themselves come "from families where discipline was pretty rigid." A few moments later the court followed up with a question as to whether the therapist "ever actually suggested to the parents that you think maybe their philosophy is little too rigid." (The answer was yes, but the therapist also said that both parents were now "more open.")

At the end of the father's testimony the court also asked the father whether he "ever discussed with Jasmine spare the rod, spoil the child. Have you ever used those words with her?" He replied that he didn't recall using the words.

Later, in oral argument at the end of the hearing, the trial court—after first noting that the case was *not* about the parents being "sort of out of step" and was "strictly a physical discipline case"—asked the county counsel, "But, how do we really kind of reconcile or fit in the parents' kind of family values and the way they would like to see their daughter raised even though we're living in 1999 in Orange County." To this county counsel replied, the

---

[3]Here is the testimony:

"Q. Now, you've said that the child wants to go home to live with her father; is that right?

"A. Yes.

"Q. Are you opposed to that?

"A. Yes.

"Q. Why?

"A. The child was told by her parents not to discuss the fact that her dad and stepmom are having problems and that stepmom has stated that she could go to court and say a domestic violence situation [*sic*] and that the court would believe her because she's white.

"Because of those difficulties in father's home I don't know what the situation is for her to go home to that [*sic*]."

"child's more likely to act out" because "she's desperately wanting to be a teenager, [and] she's not allowed to be a teenager," and because "she may not be able to communicate with her parents she may do drastic things like have boys at the house" and, ergo, because she would "act out," the parents would become "angry" and that in turn could "lead to physical harm directly through her inappropriate behavior or through inappropriate discipline."

The trial court decided to remove Jasmine from her mother's home, pointing to Jasmine's testimony that Daphne had disciplined her "in anger," had on occasion slapped her daughter, and the fact of a discrepancy in testimony concerning the removal of a nose ring that Jasmine had acquired in foster care. The court specifically stated that the case was not about Daphne's "family values" and the values that Daphne was "determined to instill in [her] daughter." The only reason the court gave for not returning Jasmine to her father, despite his counsel's having requested return to him, was that it "wasn't convinced [he] was totally ready to put in practice what he learned in parenting." Daphne then filed this appeal from the dispositional order.

### III. DISCUSSION

#### A. *The Social Worker's Belief About the Parents' Internalization of Parenting Skills and the Parents' Attitudes Toward Social Service Intervention Were Insufficient to Support Removal Under Section 361*

■ The governing statute, section 361, subdivision (c), is clear and specific: Even though children may be dependents of the juvenile court, they shall not be removed from the home in which they are residing at the time of the petition unless there is clear and convincing evidence of a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being *and* there are no "reasonable means" by which the child can be protected without removal. (See *In re James T.* (1987) 190 Cal.App.3d 58, 66 [235 Cal.Rptr. 127] [noting clarity and specificity of predecessor version of § 361].) The statute embodies "an effort to shift the emphasis of the child dependency laws to maintaining children in their natural parent's homes where it was safe to do so." (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1216 [272 Cal.Rptr. 316]; see also *In re Paul E.* (1995) 39 Cal.App.4th 996, 1005 [46 Cal.Rptr.2d 289].)

■ The case before us is remarkable for the clear and convincing evidence that it *was* safe to return Jasmine to either of her parent's homes. Both parents had forsworn corporal punishment of teenagers. Both expressed remorse for having used corporal punishment on Jasmine. Both had attended

parenting classes, and both had undergone therapy to improve their parenting skills. Jasmine had no fear of either. One therapist opined it was totally safe to return the child and the other simply had "no recommendation" (in a context where it was not at all clear that she her "hesitancy" went to Jasmine's physical safety, as distinct from what was merely optimum). Jasmine herself wanted to go home.

And so, giving full deference to the trial court's implied findings under the venerable substantial evidence rule, we must ask ourselves: What was the evidence Jasmine could not be returned safely? Three strains of evidence were put forth by the social worker, each touching on beliefs and ideas. *None* constitute clear and convincing evidence of *substantial danger* to Jasmine's safety.

The first is the subjective belief of the social worker that the parents "lack[ed] understanding of their responsibility and their roles in the incident that brought [Jasmine] to social service agency's attention." Such evidence is insufficient.[4] If a social worker's belief that parents had not sufficiently "internalized" parenting skills were enough to constitute clear and convincing evidence of substantial danger, section 361 would be effectively rendered a nullity, as social workers would become the de facto highest power in determining whether parents have their children returned to them. (See *Blanca P. v. Superior Court, supra*, 45 Cal.App.4th at p. 1751 [social worker beliefs about lack of parental internalization of parenting skills insufficient for detriment finding at 18-month review].) Such a conclusion flies in the face of the balance between family preservation and child well-being struck by the Legislature.

As to parenting skills generally, the invasive minutia that fills too much of the record in this case—the evidence about the nail polish, the trips to the mall, the rules about what sort of grades Daphne requires of Jasmine—also cannot support the trial court's judgment. It is of no legal import whatsoever that two fairly strict, religiously oriented parents trying to rear a teenager in "1999 Orange County" may lack "understanding" of teenage "issues." The inability of the parents to "understand" their teenage children is simply part of the human condition. Even the best intentioned parents, secular, religious

---

[4]*In re Dustin R.* (1997) 54 Cal.App.4th 1131 [63 Cal.Rptr.2d 269] is not to the contrary. That case involved emotional detriment and plenty of evidence from psychologists to support a finding that the mother was not able to perceive physical danger to children involving a case that arose out of a broken leg perpetrated by the father.

or otherwise, will fail to have a complete understanding of the fine nuances of teenage subculture in a postmodern industrial society.[5]

The second strain is the "lack of cooperativeness and the hostility" perceived by the social worker. The subtext here, of course, is that objectively measurable things like disavowing corporal punishment under oath can still be trumped by a parent's having *incorrect ideas* about social workers, government intervention in family life, and the whole juvenile justice "system" that do not sit well with social workers.

Even though the trial court "re-emphasized" that the case was not about Daphne's family values, preoccupation with the parents' philosophy of child rearing runs through the record, particularly exemplified in the court's questioning about "spare the rod, spoil the child," the references to Daphne and Michael's philosophical "rigidity" in child rearing, and the trial court's wondering out loud "how do we really kind of reconcile or fit in the parents' kind of family values and the way they would like to see their daughter raised even though we're living in 1999 in Orange County."

The answer, of course, is that "we"—presumably meaning the courts applying the juvenile dependency laws enacted by the Legislature—do not *need* to reconcile one couple's family values with the predominate mores of 1999 Orange County. Daphne and Michael are entitled to their own philosophical "rigidity." The dependency statutes contain no prohibition against being overprotective.[6]

Finally, the social worker also gave as a supporting reason for removal Daphne's belief in the appropriateness of corporal punishment under certain circumstances (such as defiance of her rules). Again, this was no basis on which to predicate the removal order. A parental belief in the validity of corporal punishment is most assuredly *not* clear and convincing evidence of substantial danger. There is a right of privacy under the California Constitution (art. I, § 1), and the bias of the controlling statute is on family preservation, *not* removal. (See *In re Jason L., supra*, 222 Cal.App.3d at p. 1216.) From Spock to Dobson, in a free society there will necessarily be a

---

[5]The point is regularly made in popular entertainment. From Dobie Gillis to Daria Morgendorffer *(two TV teenagers, the former from the late 1950's, the latter from the late 1990's)*, the parents of even the best behaved teenagers are regularly portrayed as totally clueless in terms of their children's "issues."

[6]And they certainly contain no mandate that parents must allow teenagers to "be teenagers" (whatever that means—other than, presumably, hanging around shopping malls).

wide range of views about corporal punishment and child rearing.[7] Of course, hitting with a belt and a switch crossed the line over into abuse. On the other hand the parents here could not be required, on pain of losing their child, to accept the social worker's view that corporal punishment is *never* appropriate, even if *some* forms of corporal punishment never are.

### B. *The Nose Ring and Prior Discipline Also Furnish No Support for Jasmine's Removal*

Jasmine's detention had an unintended indirect effect. It served, during a brief and uneasy placement in a foster home, as the occasion for Jasmine to have her nose pierced and acquire a nose stud. Prior to the dispositional hearing, during a visit with Jasmine, Daphne removed the stud with Jasmine's acquiescence, if not at her request.

We will begin by noting an obvious irony, the details of which, unfortunately, were not developed in the record: What in the world is going on when a 15-year is removed from her family, put into supposedly "protective" custody, and the first thing that happens is that she gets a nose stud? And who gave the parental consent that should have been obtained before any body piercing was done? (See Pen. Code, § 652, subd. (a) ["It shall be an infraction for any person to perform . . . body piercing upon a person under the age of 18 years, unless the body piercing is performed in the presence of, or as directed by a notarized writing by, the person's parent or guardian."].) We trust the social services agency had no hand in Jasmine's initial acquisition of the nose stud.

The trial court was more interested in how the stud got removed. From county counsel's description of the incident, one would think that Jasmine acquired a nose ring which Daphne "ripped" out.[8] That is a distortion of the record. It was a *stud*, not a *ring*, and Jasmine testified that Daphne *tried* to take it out *gently*, but simply didn't succeed. It "felt" like it was being ripped out.[9] Daphne herself testified that she "grabbed the prong and this part and pulled it out."

---

[7]Indeed, by the end of the 20th century spanking has been making a bit of a comeback in terms of general acceptance. (See Costello, *Spanking Makes a Comeback*, Wall Street Journal (June 9, 2000) p. W1 ["Tired of Spoiling the Child, Parents Stop Sparing the Rod; Dr. Dobson vs. Dr. Spock"].)

[8]Here is the description from the county's brief: "Jasmine testified that after being placed in foster care, she had her nose pierced. When her mother saw the nose ring during a visit, she 'ripped' it out."

[9]Here is the text from the transcript:
"The court: So your nose was pierced?
"The minor: It was.
"The court: Okay.

While the two versions are not inconsistent (in both, Jasmine and her mother agreed that Jasmine acquiesced to having her mother remove the nose stud), it still must be recognized that Daphne was probably too rough in removing the nose stud. Even so, the discrepancy is not *clear and convincing* evidence of substantial danger. It is, rather, understandable parental irritation with the fact that the removal of a teenager had resulted in the direct undermining of a family rule. Again, it must be recognized that the dependency statutes are a series of structured procedures and substantive rules intended to balance the protection of children and family preservation, not to impose the values, let alone the aesthetics, of "1999 Orange County" on any particular family. If Daphne and Michael want to take a stand against currently fashionable self-mutilation, there is nothing in the dependency statutes to prevent them. There is no evidence that the removal was against Jasmine's will—it appears that she was somewhat ashamed herself of having acquired the nose stud and so readily accepted Daphne's demand that it be removed—only that the removal was done, perhaps, too roughly. That is not clear and convincing evidence of any danger.

As to being disciplined at times "in anger," again, the evidence is not substantial. The mere fact that a parent is angry when he or she disciplines a child is not enough to show substantial danger. Not every parent can affect the mien of Mister Rogers when disciplining a child. Discipline is usually associated with some anger; often the anger itself comes from the parent trying to be protective. And as for the slapping, it is enough that the uncontroverted testimony was that both Daphne and Michael had forsaken corporal punishment.

C. *There Was Absolutely No Basis Not to Return Jasmine to Her Father*

■   Finally, the question of why the trial court did not place Jasmine with Michael cries out to be addressed, even though the matter is, strictly speaking, dicta. Michael has, after all, not filed an appeal of his own. His counsel at trial specifically requested that Jasmine be placed with Michael. Jasmine herself said that while she wanted to go back to either parent, her preference would have been her father.

The only direct negative evidence in the record bearing on whether Jasmine could be placed with Michael is the social worker's opinion concerning Michael's marital troubles, and that opinion appears to have based

---

"The minor: My mother took it out.
"The court: Did she take it out gently?
"The minor: No, she didn't.
"The court: Kind of grabbed it and yanked it out?
"The minor: It was still healing a little bit so it was sore. [¶] So, I guess maybe more she was trying to take it out gently but it felt more she a [*sic*] was ripping it out of me."

on something wholly unfounded, namely a statement by Michael's wife to the social worker in which there are some very ugly imputations of racial bias against trial courts generally—namely, that they will rubber-stamp false allegations of domestic violence made by a White female wife against a Black male husband.[10] Suffice to say, such an opinion could in no way serve as substantial evidence under section 361. And beyond that there is only the trial court's subjective perception that Michael wasn't "totally ready to put into practice what he learned in parenting," which is in the same legal category as inadequate "internalization."

Section 361 requires that there be "no reasonable means" of preventing removal. The evidence on conjoint therapy alluded to the standards of an ideal world; essentially, things would be *better* if the conjoint therapy were completed before return. But there was no substantial reason given as to why conjoint therapy was *required* before return. And that too made the order subject to reversal.

To confirm our conclusion, we are informed by Jasmine's counsel on appeal that subsequent to the appealed order, she was indeed placed with Michael for a 60-day "visit." The lack of danger under section 361 is thus self-evident. (See *In re Damonte A.* (1997) 57 Cal.App.4th 894, 899 [67 Cal.Rptr.2d 369].)

### DISPOSITION

The dispositional order is reversed. The case is remanded for further proceedings consistent with this opinion. In light of Jasmine's subsequent (and apparently successful) placement with Michael, our decision here is without prejudice to any party on remand as whether Jasmine should be placed with Daphne *or* Michael. *That* question should be considered de novo by the juvenile court.

Rylaarsdam, J., and O'Leary, J., concurred.

---

[10]That's the best we can do with the social worker's testimony, which we have already quoted in footnote 3, *ante.*