Filed 4/22/21  In re Heidi E. CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re HEIDI E., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. K.E., Defendant and Appellant. | A160765 (Alameda County Super. Ct. No. JD03018001) |

Mother K.E. appeals from orders made at an 18-month status review hearing denying return of her daughter to her care.  She contends there was insufficient evidence to support the court's findings that placement with her would put the minor at substantial risk of harm and that reasonable services had been provided.  We affirm.

## BACKGROUND

The facts underlying this dependency case were related at length in our recent opinion affirming the juvenile court's orders at the 12-month review hearing.  (*In re Heidi E.* (Feb. 26, 2021, A159813) [nonpub. opn.].)  In summary, Heidi and her older sister D.G. were removed from mother's custody in September 2018, and subsequently declared dependents under

1

Welfare and Institutions Code section 300 due to mother's drinking and physical abuse of the children.[1]  Heidi was then 10 years old and D.G. 14 years old.

Mother's case plan identified service objectives of not using physical punishment, staying sober and appropriately parenting the children, and required her to engage in both individual counseling and family therapy, complete a parenting education class, and participate in a drug and alcohol assessment, and follow the resulting recommendations.  Mother completed a parenting class and participated in visitation and family therapy with the minors, but attended only a few sessions of individual therapy before stopping due to vehicle problems.  Efforts were made to find a therapist who could see mother on weekends, as mother reported she could not engage in the case plan during working hours due to her full time work schedule and long commute.  Mother reportedly did not believe she needed individual therapy because she was participating in family therapy.  She also reportedly

---

[1] Further statutory references will be to the Welfare and Institutions Code.

The section 300 petition filed by the Alameda County Social Services Agency (Agency) alleged that mother hit the minors with her hands, a phone cord, and a hanger, resulting in marks and bruises on both minors, and had been arrested for child endangerment (§ 300, subd. (a)); the minors reported mother drank to intoxication approximately once a week, became extremely angry or sad and would yell at or hit them when she was drinking, they avoided her when she had been drinking because they were afraid of her, and they did not want to live with her (§ 300, subd. (b)); and the Agency had been unable to contact mother to assess her ability to have custody of the children and the alleged father reportedly lived in Mexico and did not have legal custody of either minor (§ 300, subd. (g)).

Mother waived her right to trial and submitted on the social worker's report, and the juvenile court found the allegations true, removed the children from mother's custody, and ordered family reunification services.

did not believe she had a substance abuse problem. The substance abuse program, Terra Firma, had at first recommended a formal alcohol treatment program, but subsequently told the Agency mother did not need treatment other than substance abuse testing. Mother's tests were primarily scheduled rather than random, and their frequency was gradually reduced over the course of the dependency, at mother's request, to accommodate her work schedule. Her tests were negative except for two dilute samples early in the case.

Both minors initially expressed great concern that if they returned home they would not be able to see their aunt, with whom mother had a contentious relationship. Heidi engaged in individual therapy and was diagnosed with posttraumatic stress disorder (PTSD) at least in part due to mother's physical abuse and alcohol use.

At the six-month review hearing in March 2019, the trial court found mother had made partial progress on her case plan, continued services, and gave the Agency discretion to begin overnight visits and a trial two-week visit.

In July 2019, the Agency recommended returning the minors home under a family maintenance plan, a recommendation with which D.G. agreed but Heidi did not. Heidi was concerned that mother had not changed her behaviors and asked if she could be placed with her aunt. The Agency reported concern that the aunt was not supportive of reunification and was encouraging Heidi to refuse to return home. Mother appeared to be abstaining from alcohol use.

On July 15, 2019, the court returned D.G. to mother's care and set a contested hearing for Heidi, which eventually took place in late 2019 and early 2020. Heidi testified that she continued to feel uncomfortable with and

afraid of mother, and described several specific incidents that caused her concern. Her court appointed special advocate (CASA) also testified about Heidi's concerns, and recommended Heidi remain in her current placement and continue therapy with mother. Stephanie McWoods, the child welfare worker, and the assigned Family Preservation Program worker both testified that mother had complied with her case plan except for the individual therapy component and they considered it safe for Heidi to return home. Mother testified that she believed she was in compliance with her case plan and denied the incidents Heidi described; she did not believe Heidi was afraid of her or did not trust her and believed Heidi did not want to come home because she wanted to live with her aunt.

The juvenile court ruled that returning Heidi to mother's care would create a substantial risk of detriment to her safety, protection or physical or emotional well-being because mother had not participated regularly and made substantive progress in court-ordered treatment programs, made substantial progress in complying with the case plan, or alleviated or mitigated the conditions necessitating out-of-home placement. Expressly finding mother was not a credible witness and Heidi was highly credible, the court was critical of both mother's failure to participate in aspects of the case plan and the Agency's acceptance of these failures, and concerned that family therapy had focused on D.G., and the case workers had minimized Heidi's expressed fears. The court found mother's compliance with the case plan as it related to Heidi had been "minimal" and that mother "is not aware, is not reflective, has not made the substantial level of growth and progress and amelioration that is required for the youth to safely return home."

This ruling on February 14, 2020, came only shortly before the date previously set for the 18-month hearing, February 24, 2020. On that date,

4

the matter was continued to March 11, 2020, then set for another contested hearing, which was ultimately held over two days in August 2020.

As of its March 2020 report, the Agency still recommended that Heidi be returned to mother's home; Heidi continued to disagree. The Agency reported that mother had mitigated safety concerns, and stated concerns that Heidi's relationship with her aunt had interfered with reunification and allowing Heidi to choose whether to return home, absent safety issues, would be detrimental to her development and future relationships. The Agency was also concerned that Heidi's caregiver was not supportive of reunification, had made disparaging remarks about mother in front of Heidi and over-utilized the aunt for Heidi's care, and that "mother has been labeled an alcoholic, angry, and entitled by service providers instead of being supported and collaborated with on how to better support the mother in reunifying."

Family therapy was continuing, focused primarily on relationship dynamics and communication skills. The therapist reported that Heidi " 'has apprehension about returning and that things at home have not changed,' " and that her developmental phase "is a significant part of the friction," with Heidi wanting to make her own decisions and mother having an " 'I know what is best for you' " perspective. The therapist was concerned mother and Heidi were not utilizing their communication skills outside of therapy and felt they would benefit from having more contact with each other. He believed Heidi was comfortable with her current living arrangement because she had physical and mental space rather than having to share space with her sister at home.

Heidi wanted to be placed with her aunt and the Agency was assessing this placement, which mother opposed. Heidi continued to visit with her aunt rather than mother. When McWoods asked how scared she was of her

mother on a scale from one to ten, Heidi responded seven, giving as an example that she would flinch if someone raised a hand for a high five. She said she had not been visiting with mother because she was "a bit uncomfortable" due to " 'old memories.' " She felt mother was not very interested in family therapy: " 'I feel like my mom don't want to be there, she's on her phone and looking through messages.' " Mother was continuing to test for substance use once a month; the program reported mother's assessment indicated a " 'Slight Problem,' " and the Agency's child care worker noted mother did not appear to meet the criteria for "Alcohol Use Disorder as stated in the Diagnostic and Statistical Manual of Mental Disorders fifth edition (DSM-5)." D.G. was doing well enough at home that her dependency had been dismissed. Mother was not using physical punishment.

On July 20, 2020, Heidi's CASA filed a report recommending that Heidi be placed with her aunt. According to this report, Heidi continued to feel mother was "not trying" in family therapy sessions, and family visits had decreased since February. Due to the COVID-19 shelter in place order, Heidi had been spending most of her days and many nights with her aunt.

The Agency informed the court it had changed its recommendation and, in a report filed on August 4, 2020, recommended terminating reunification services and continuing Heidi's current placement, with a permanent plan of "fit and willing relative" with the aunt. Heidi continued to feel uncomfortable returning to mother's home, saying she feared mother would continue to drink and might hit her. Heidi said she did not trust mother, for reasons including that in the past, mother often would tell her and D.G. she would not hit them again, then hit them when she became upset with them. Asked about her current fears, Heidi said "her only fears" were "heights, and the

ocean, and her mother." At the end of July, Heidi told McWoods she wanted to "take a break with family therapy" and reported that mother had said she would "cut her off" if Heidi ended up living with the aunt. Heidi provided only vague information about this incident, saying she had told her attorney and did not want to discuss it again.

Mother expressed concerns that Heidi needed glasses and braces, was not getting proper nutrition, and was having headaches that mother believed indicated a medical condition was not being treated. Mother told McWoods that when Heidi was with her, "I don't want to touch her. I'm afraid to say anything to her because I don't want her to say my mom made me do this." Mother did not want the aunt to get custody and was concerned the aunt's mental health was not stable and would cause issues for Heidi.

The Agency had asked Terra Firma to provide random testing for mother and mother had tested negative on four dates between May 6 and May 14. McWoods "recognize[d] that the mother has made strides in providing negative drug and alcohol tests as well as complied with the court in providing four negative drug/alcohol tests," but "[g]iven that Heidi is refusing to visit with her mother and is not interested in returning to her mother's home, the Agency cannot say that reunification will be successful."

The hearing on August 10 and 12 was held by teleconference due to COVID-19. McWoods testified that individual therapy was removed from mother's case plan because mother made it clear she was not interested in individual therapy and it was "practically impossible" for her to meet with a therapist because there were none available on weekends. McWoods had not asked mother to undergo substance abuse tests since the negative tests in May. In McWoods's opinion, mother had complied with the family therapy and substance abuse testing components of her case plan, and had done the

7

best she could regarding visiting and providing for Heidi, considering that Heidi was not willing to have visits.

McWoods testified that mother wanted visits with Heidi but did not want to force her and was attempting to be sensitive to Heidi's request for space. McWoods testified that she changed her recommendation for Heidi's placement because it did not appear Heidi could "safely and comfortably return to her mother's home," as few visits were happening and Heidi and mother were not talking on the phone to prepare for a transition back to mother's home. McWoods observed that the change to virtual family therapy required by COVID-19 created even more distance between Heidi and mother, contrary to the increased contact the therapist recommended. McWoods clarified that her reference to safety was meant to refer to Heidi's perception of safety; the risk in returning her to mother's home was to Heidi's emotional well-being. The recommendation that Heidi not return to mother's home was further supported by Heidi's report of mother saying Heidi would be cut off if she was placed with the aunt, which appeared to put Heidi in the position of having to choose between mother and the aunt. Additionally, mother's worry about touching Heidi or saying anything to her that could be misinterpreted caused McWoods to be concerned that mother would not be able to parent Heidi "authentically," and made it difficult to assess how mother would handle discipline and ordinary life disappointments "mom has to be very cautious about her choice of words and can't speak freely and from her heart." McWoods testified it would not be in Heidi's best interest to disregard her wishes regarding return even if mother had technically complied with substantial parts of her case plan. Heidi's refusal to return home and the fear she expressed when asked about her mother indicated the

relationship between them had not been repaired, which was of concern in light of Heidi's PTSD diagnosis.

Mother's counsel argued that the Agency had not demonstrated substantial risk of detriment, as required for the court to continue out-of-home placement, because there was no evidence mother was drinking or using physical punishment and she had complied with everything the Agency asked of her. Counsel maintained there had not been an opportunity for mother to demonstrate she had made progress, or for her relationship with Heidi to heal, because Heidi refused to visit; Heidi's fears that mother would continue to drink and might hit her were not reasonable; and her continued discomfort could be addressed with additional therapy. In counsel's view, Heidi had decided she was old enough to make her own decisions and did not want to return home because she was comfortable in her foster placement, where she had her own room and was able to spend most of her time with her aunt.

Counsel for the minor emphasized that the past abuse had traumatized Heidi and damaged her ability to trust mother, and that Heidi continued to express fear of mother. Counsel argued that reunification services were designed to help repair the relationship by mother gaining insight, as well as sobriety, but mother chose to participate only in some aspects of the case and family therapy had not resulted in development of the communication skills the family needed. Counsel for the Agency, too, focused on the need for, and absence of, substantive progress toward alleviating the causes of the dependency rather than just technical compliance with the case plan.

At the conclusion of the hearing, the juvenile court found that returning Heidi to mother's care would create a substantial risk of detriment to the emotional well-being of the child. The court found there had not been

9

substantial improvements since the 12-month hearing, explaining that simply attending therapy sessions and providing four random alcohol tests in a one-month period was insufficient as mother did not appear to have integrated anything she had learned but rather was blaming Heidi for the lack of progress. The court particularly noted, as evidence of risk to Heidi, mother's threat to cut Heidi off if she was placed with her aunt and Heidi's statement that her mother was one of her "top three fears in the world," and Heidi's continuing PTSD.

The court found reasonable services had been offered or provided and mother's progress had been "partial"; terminated reunification services; and ordered a permanent plan of "fit and willing relative," with Heidi's current placement continuing and the Agency to assess the appropriateness of placement with the aunt upon completion of the Resource Family Approval process, to which she had been referred. The court continued the matter for six months for a status review hearing.

## DISCUSSION

### I.

At the 18-month review hearing, "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1).) Mother contends Heidi should be returned to her custody because the evidence does not support the trial court's detriment finding.

"The standard for showing detriment is 'a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit

10

from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.' (*David B. v. Superior Court* [(2004)] 123 Cal.App.4th [768,] 789.) Rather, the risk of detriment must be *substantial,* such that returning a child to parental custody represents some danger to the child's physical or emotional well-being. (*Id.* at p. 788; *Rita L. v. Superior Court* [(2005)] 128 Cal.App.4th [495,] 505.)" (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400 (*Yvonne W.*).) The Agency has the burden of establishing detriment. (§ 366.22, subd. (a).) This court reviews the record to determine whether substantial evidence supports the juvenile court's finding of substantial risk of detriment to Heidi if she is returned to mother's care. (*Yvonne W.,* at pp. 1400–1401.) In so doing, we "resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible." (*In re David M.* (2005) 134 Cal.App.4th 822, 828.)

Mother attempts to demonstrate the insufficiency of the evidence here by contrasting her case with several others. None are particularly helpful, as none address issues similar to those upon which the juvenile court based its decision. *In re Armando L.* (1995) 36 Cal.App.4th 549, 555 (*Armando L.*), involved an infant who tested positive for amphetamines and Valium at birth and was removed from the custody of his mother, a frequent drug user who was unable to care for him. (*Id.* at p. 551.) The decision upheld the juvenile court's determination that giving custody of the child to his father would create a substantial risk of detriment to the child's emotional well-being because the father made no effort to be involved with Armando for the first 13 months of the baby's life and first visited when Armando was 15 months old. (*Id.* at p. 555.) Mother argues she has always been involved in Heidi's life and, while the father's lack of effort in *Armando L.* was "a hallmark of

that case," she has cooperated with the social workers and "diligently pursued her case plan."

Whether mother diligently pursued her case plan is a matter of dispute in this case: As discussed in our prior opinion, the juvenile court viewed mother as having resisted and manipulated the individual therapy and alcohol testing components of her case plan, and criticized the Agency's acquiescence in modifying requirements of the plan. The court made similar observations at the 18-month hearing, expressing puzzlement how mother was allowed to "opt[] out" of individual therapy and noting that the four random tests mother provided subsequent to the 12-month hearing were the only random tests during the 18 months of the dependency.

More to the point, the juvenile court's decision at the 18-month hearing was based on its conclusion that mother had not made any "real substantial change" with respect to understanding Heidi's concerns and fears, continuing to disclaim any need for individual therapy and blaming the lack of progress in the case on Heidi's refusal to visit. Rejecting mother's portrayal of the case as "a sassy pre-teen just asserting her will in the world" and "want[ing] things because they are better somewhere else," the court recalled Heidi being "frightened and terrified to testify" at the 12-month hearing, emphasized Heidi's telling the child care worker that her three top fears are "heights, and the ocean, and her mother," and viewed Heidi's "extreme states of fear" and description of flinching when someone raised a hand for a high-five as showing Heidi was still suffering from PTSD. The juvenile court concluded that despite mother having attended family therapy sessions, she had not "integrated" lessons in how to understand and communicate with Heidi, and returning Heidi to mother's care without mother having worked

toward fostering a basis for regaining Heidi's trust, posed a substantial risk of harm to Heidi's emotional well-being.

The other cases mother relies on offer no more guidance with regard to these issues than *Armando L.* In *J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, the father's daughters were detained due to abuse by their stepmother. The juvenile court's order after the 12-month hearing, terminating reunification services for the father, was upheld on the basis of evidence that the father's compliance with the case plan was minimal, he was hostile toward the child welfare workers and did not intend to continue to work with them, and he denied needing therapy despite his history of domestic violence. (*Id.* at p. 535.) Mother argues that she, by contrast, complied with her case plan, except for individual therapy, and McWoods testified that she was in compliance. This argument ignores both that the trial court questioned mother's compliance in light of her resistance to individual therapy and limited participation in random substance abuse testing throughout the case, and the actual basis of the juvenile court's orders, which was that technical compliance with the case plan was not sufficient in light of Heidi's profound fear of mother and mother's failure to progress in understanding Heidi or developing skills to rebuild their relationship.

In *Yvonne W., supra,* 165 Cal.App.4th at page 1402, at the 18-month hearing, the agency recommended against returning the 11-year-old minor to her mother until the two participated in conjoint therapy. Mother points out that she and Heidi had participated in family therapy for an extended time. Again, mother ignores the fact that the juvenile court found her compliance in attending family therapy sessions insufficient because mother did not appear to have utilized this therapy to repair her relationship with Heidi. In

13

*Yvonne W.,* the mother had completed her case plan, made changes in her life that were in her children's best interests, acquired knowledge of positive parenting and was able to show empathy, and the minor's behavior had improved as a result of regular visits with the mother. (*Id.* at p. 1401.)

Mother points out that the *Yvonne W.* court also rejected the argument of the agency in that case that more time was necessary for a smooth transition for the minor. (*Yvonne W., supra,* 165 Cal.App.4th at pp. 1402–1403.) *Yvonne W.* found this argument "contrary to the legislative presumption that a minor will be returned to parental custody no later than the 18-month date, *absent a showing of substantial detriment.*" (*Id.* at p. 1403, italics added.) But in the present case there *is* substantial evidence of detriment. Nothing in *Yvonne W.* suggests the need for transition is an improper consideration where a minor suffers from PTSD, at least in part due to the parent's conduct and remains afraid of the parent, and the parent has not developed the empathy and communication skills necessary to repair the parent-child relationship.

As the juvenile court recognized, a parent's completion of the case plan "does not mean [the parent is] entitled to custody of the minor regardless of the substantial risk of detriment that reunification would have on the minor's emotional well-being." (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 901.) "[T]he question whether to return a child to parental custody is not governed solely by whether the parent has corrected the problem that required court intervention; rather, the court must consider the effect such return would have on the child. It defies common sense to conclude that a child who has become severely disturbed emotionally as an outgrowth of physical abuse administered by a parent and who will suffer further emotional trauma if compelled to return to parental custody must nonetheless be returned

14

because the parent's successful completion of reunification services indicates further physical abuse is unlikely." (*Ibid.*)  "[S]imply complying with the reunification plan by attending the required therapy sessions and visiting the children is to be considered by the court; but it is not determinative.  The court must also consider the parents' progress and their capacity to meet the objectives of the plan; otherwise the reasons for removing the children out-of-home will not have been ameliorated." (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143.)

On this record, substantial evidence supports the juvenile court's conclusion that returning Heidi to mother's custody posed a substantial risk of detriment to Heidi's emotional well-being.

## II.

Mother also contends the evidence does not support the juvenile court's finding that reasonable services were provided with respect to the alcohol testing portion of the case plan.  At the 12-month hearing, the court stated it was not confident mother was alcohol-free, in part because her testing had not been random.[2]  After that hearing, the Agency referred mother for random testing and she complied, providing four negative tests.  The court commented at the 18-month hearing that it did not find these four random tests "as persuasive as mother would like me to when, during the 18 months of this case, those were the only random drug tests that I recall."  Mother argues that since she did everything the Agency asked of her, the court's criticism shows she was not provided with reasonable services and, to the extent the juvenile court's detriment finding was based on finding mother did

---

[2] As discussed in our earlier opinion, the trial court criticized the fact that mother's substance abuse testing had been pursuant to a schedule rather than random, which the court viewed as resulting from mother's manipulation of the system.  (*In re Heidi E., supra,* A159813.)

15

not make sufficient progress on the substance abuse portion of her case plan, the reasonable services finding should be reversed.

As mother did not object to the adequacy of the case plan either to the Agency during the period between the 12 and 18-month hearings or at the 18-month hearing, the Agency argues she forfeited the issue. (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416 [mother had assistance of counsel to seek guidance from court if mother felt services inadequate during reunification period].) Having heard the court's concerns at the 12-month hearing, mother should not have been surprised the court did not view four random tests in one month of a six-month period persuasive. Dependency matters are subject to the rule that "a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293) "The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected." (*Ibid.*) While application of the forfeiture rule is not automatic, "the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue." (*Ibid.*) "Although an appellate court's discretion to consider forfeited claims extends to dependency cases [citations], the discretion must be exercised with special care in such matters. 'Dependency proceedings in the juvenile court are special proceedings with their own set of rules, governed, in general, by the Welfare and Institutions Code.' (*In re Chantal S.* (1996) 13 Cal.4th 196, 200.) Because these proceedings involve the well-being of children, considerations such as permanency and stability are of paramount importance. (§ 366.26.)" (*Ibid.*)

Even if we were to excuse the forfeiture, mother's argument would not be availing. Mother expressly challenges the reasonable services finding only

to the extent the juvenile court's detriment finding was based on finding mother made insufficient progress with regard to substance abuse. The juvenile court's explanation of its ruling makes clear that any issue regarding mother's sobriety was *not* its primary concern.

While the court mentioned it was not impressed with the four random tests mother provided, this was a passing reference in the course of a lengthy discussion of the court's reasons for concluding mother had not gained insight or communication skills from family therapy despite attending the sessions. The court found mother's threat to cut Heidi off if she was placed with her aunt "very intimidating, emotionally harmful," noting, "we can all infer and understand the impact [these words] would have on a 12-year-old." The court observed that the evidence showed Heidi was still actively suffering from PTSD and found "compelling" the evidence that Heidi said her mother was one of her top three fears in the world. As we have noted, the court was critical of mother's choice not to engage in individual therapy and apparent view that Heidi was at fault for the lack of progress toward reunification: "I don't think mother has integrated any learnings. I think this is a case where everything is being shunned off to Heidi. It's Heidi's fault. It's Heidi's fault she doesn't want to visit her mom. It's Heidi's fault. And I don't think the evidence supports that. I think the adult, the parent in this family, has an obligation, under the reunification process, to not just check the boxes and go through the motions, but to make progress, emotional growth and progress. [¶] And the fact that she opted out, for example, of individual therapy, I'm not even clear how that's possible under a case plan to say, well, no, I don't choose that. But it would seem that if one's child doesn't want to be with us, you might self-reflect and look in the mirror and engage with some therapy about that yourself. It can't all be a 12-year-old's fault."

In short, the court determined that Heidi remained at risk because there had been no substantial improvement since the 12-month hearing in mother's understanding of Heidi and the problems in their relationship or development of the communication skills and emotional foundation necessary for Heidi to feel safe in mother's care. Mother's alcohol use was not a primary focus of the court's finding and any deficiency in services related to her alcohol use, therefore, was not a significant factor in the outcome of this case.

## DISPOSITION

The orders are affirmed.

　　　　　　　　　　　　　　　　　　　_____

　　　　　　　　　　　　　　　　　　　Kline, P.J.


We concur:


_____

Richman, J.


_____

Stewart, J.


*In re Heidi E.* (A160765)