[No. A074044. First Dist., Div Two. May 5, 1997.]

In re DUSTIN R. et al., Persons Coming Under the Juvenile Court Law.
ALAMEDA COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
CATHERINE R., Defendant and Appellant.

**COUNSEL**

Alan R. Bergman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kelvin H. Booty, Jr., County Counsel, and Anthony E. Scarr, Deputy County Counsel, for Plaintiff and Respondent.

## Opinion

**LAMBDEN, J.**—Catherine R. (mother) and Gary R. (father) are the parents of three children who were made dependents of the court. Mother is appealing from the juvenile court's order which terminated family reunification services and established long-term foster care as the permanent plan for the three children pursuant to Welfare and Institutions Code section 366.22, subdivision (a). (All further unspecified code sections refer to the Welfare and Institutions Code.) Mother contends the court erred in finding the children's return to the family would create a substantial risk of detriment to the minors' well-being, because the court disregarded mother's completion of the reunification plan.

We find the court did evaluate mother's progress towards meeting the goals of the reunification plan and properly found she had not alleviated the causes requiring placement in out-of-home care. We therefore deny the requested relief.

### Background

Mother and father were married on October 2, 1992. They have three children, Nina, Dustin, and Gary; born, respectively, in May 1991, June 1992, and November 1993. In addition to these three children, mother had six other children from two previous marriages. Five of those children are now adults, and relatives have the legal guardianship of the sixth.

During the evening of August 6, 1994, Nina, Dustin, and Gary were in father's care while mother was away from home. The following day Nina complained about her leg hurting and her mother took her to the hospital. Nina had suffered a spiral fracture of the left femur; the injury occurred, she claimed, when she was playing with her father. The hospital staff notified the police because the examining doctor believed the injury was inconsistent with the explanation given.

The Alameda County Social Services Agency (SSA) filed a juvenile dependency petition pursuant to section 300. Nina was made a dependent under section 300, subdivisions (a) and (b); Dustin and Gary were each declared dependents under subdivisions (b) and (j). On August 12, 1994, an amended petition was filed and it added an allegation against the mother for

her past inability to protect three (of her six) older children from physical abuse and neglect. (These three children had been "permanently planned" by the juvenile court.)

On October 26, 1994, the juvenile court sustained the allegations in the amended petition and adjudged the minors dependents of the juvenile court under section 300, subdivisions (a), (b), and (j). The minors were placed out of home, and a separate, but identical, reunification plan was established for each parent. The plan contained the following requirements: (1) meet regularly with the county social worker, cooperate in developing a service agreement, and notify the worker of any changes in her [his] situation; (2) sign necessary authorizations for release of confidential information, so that her [his] compliance could be monitored; (3) maintain visitation with the children; (4) successfully complete a parent-education program; (5) maintain a stable, safe, and sanitary place for the children to live; (6) refrain from physical punishment of the children; (7) demonstrate knowledge of nonphysical, age-appropriate discipline techniques; (8) participate in counseling or therapy, as directed by the social worker, which addresses issues of physical abuse, parenting, family issues, and age-appropriate discipline; and (9) be evaluated and treated by a therapist who will provide the court with a report addressing the mother's [father's] ability to protect and provide adequately for the minors, the mother's [father's] level of participation, and the mother's [father's] ability and capacity to provide adequately for the emotional and physical well-being of the minors.

The juvenile court held the six-month review hearing on February 1, 1995. The report from the SSA stated Nina was very fearful; while Dustin was delayed in daily living skills, had episodes of head banging, and had language skills below his age level. The youngest child, Gary, was depicted as having occasional tantrums and being "clingy." The parents had participated in supervised visits with the children and the foster parents noted when the children cried or otherwise made the father uncomfortable, he immediately gave them to the mother or foster parents. The parents also had attended therapy sessions with Felicitas Bejarano (Bejarano), and she recommended a psychological evaluation for both parents. Accordingly, the juvenile court ordered reunification services continued and added, without objection, a requirement for psychological evaluations of the parents.

Mother underwent the psychological evaluation in March 1995. Sandra L. Dye (Dye), the examiner, had two areas of concern regarding mother's ability to parent her children: (1) she failed to be aware of environmental cues, such as not perceiving anything unusual about her husband's behaviors; and (2) she had serious limitations in her ability to profit from her

mistakes, such as marrying abusive men. The examiner concluded the parents lacked the resources to provide "the highly structured, nurturing environment necessary to adequately meet their children's special needs," and recommended counseling for mother to increase "her ability to make consistently accurate and appropriate judgment based upon her improved observational skills."

Father also was evaluated by Dye and she concluded: "The findings of this evaluation suggest that [father] will continue to have difficulty managing his own life as a result of his disturbance in his thinking and emotions. Thus, it will be difficult for him to adequately address his children's needs. He is unlikely to develop any self awareness or insight into his serious cognitive disarray and affective disorder. He has become tolerant of his symptoms and is so accepting of his idiosyncratic logic system that he is likely to view himself as functioning quite adequately. Based upon these findings, I would strongly recommend that his contacts with his children continue to be closely supervised."

Mother also saw Glenn Horwitz (Horwitz), a therapist at the Family Services of the East Bay. The treatment was to help her improve "her ability to protect and care for her children and provide for their emotional and physical well being." He reported her attendance at sessions was good, but she continued to use the psychological defense mechanism of "denial."

Bejarano, the therapist seeing the parents as a couple, reported, in part, on July 5, 1995: "The childrens [sic] presence in three sessions was helpful in observing the parents interacting with them. Catherine had no hesitation in providing attention to her children. In contrast, Gary the first session [sic] was very cautious in picking up and interacting with his children. . . . [¶] Although Catherine and Gary are good in making it to sessions, they are unfortunately not using the sessions as would be hoped. It is likely they see counseling as a criteria [sic] for reunification but that attendance is the key factor."

The therapist hired by the county to treat Nina, found Nina was seriously emotionally disturbed, being angry, anxious, and unusually destructive; she therefore recommended Nina needed more "extensive treatment." She also reported both Nina and Dustin, who were seen together for nine therapy sessions, were seriously disturbed by an "Overanxious Disorder" which "interferes with their ability to master normal psychosocial developmental tasks." She surmised their behavior was consistent with a history of physical abuse rather than resulting from a single incident.

The 12-month review hearing occurred on August 25, 1995. The report from the SSA stated the following: "The parents are participating in counseling and parenting classes, but appear to [be] 'going through the motions'

without ever dealing with the abuse. They also seem oblivious to the disturbed behavior displayed by Nina and Dustin." It recommended, in part, "[t]hat the parents have made substantial progress in complying with the case plan but have not alleviated or mitigated the causes necessitating placement of the children in out-of-home care."

At the end of the 12-month review hearing, the juvenile court found mother had made "substantial progress" towards reunification, but returning the children to the family posed a substantial risk of detriment to the minors "because the parents have not completed the reunification plan and the father is currently incarcerated." The father had been serving a three-month sentence after pleading guilty to the criminal charges related to Nina's injury. The juvenile court also found by clear and convincing evidence reasonable reunification services had been provided, and found a substantial probability of reunification within six months.

The 18-month review hearing occurred on 3 separate court dates in February and March 1996. Hagit Glickman, Ph.D. (Glickman) had examined Nina and Dustin. He found Nina was delayed approximately one year in her cognitive abilities, and exhibited aggressive and regressive behaviors. He concluded Nina's developmental delays were "likely due to the emotional trauma of abuse and neglect." Similarly, Dustin was delayed in social and living skills, particularly in language skills. Dustin had tantrums and had exhibited "unusual behaviors" at the time of removal from his home, including head banging, biting, and aggressive behavior towards other children. His developmental delays were evaluated as "likely due to neglect and possible physical abuse."

Glickman observed the three children interact with their parents. The mother's "interactions with the children were positive but generally bland. She did not appear aware of the children's unusual and withdrawn behavior." The mother was more comfortable interacting with the children without her husband; "[w]hen the mother was alone with the children, they all sat closer to her and responded to her attempts at play." Glickman concluded the parents as a unit appeared to have a very limited awareness of the needs of their children and mother "remains in denial about her husband's inappropriate interactions and the children's complicated needs." He recommended: ". . . the parents must have supervised visits by a professional who is aware of appropriate and inappropriate behavior on the part of the parents regarding their children."

Mother's therapist, Horwitz, reported she was less defensive and more revealing. Horwitz found she "demonstrated adequate judgment and awareness of the situation." Additionally at the hearing, mother acknowledged her

husband's responsibility for Nina's injury and she accepted some responsibility for failing to protect Nina from the injury.

The child welfare worker, Laura Loomis (Loomis), reported mother had substantially complied with her reunification plan. Loomis concluded, however, the psychological evaluation of mother showed "considerable concern about the mother's judgment and her inability to recognize her husband's problematic behavior and her children's specialized problems." She believed the parents had not gained any insight from their participation in counseling and parenting classes. Loomis also reported all three children were "displaying severe emotional disturbance," and were not adoptable because of this. Because of the desirability of keeping the three children together, she recommended long-term foster care as the permanent plan to be implemented.

On March 6, 1996, the court found the following: "There's another very recent case, In re Joseph B., . . . . That was a case where basically the parent completed the reunification plan and the Court felt compelled to return the children because of completion of the reunification plan, as I recall it. [¶] . . . It talks about the Court shall order the return of the minor to the physical custody of his or her parent or guardian unless, by a preponderance of the evidence, it finds that return of the child would create a substantial risk of detriment to the physical or emotional well-being of the minor. [¶] The focus of the finding is not on the parent. The focus of the finding is on the minor and will there be detriment to the minor by return of the child to the parent. [¶] And the reports by Dr. Glickman both indicate this finding, in effect, by the doctor that the parents appear to have very limited awareness of both emotional and physical needs of their children. 'They clearly do not recognize how their past behavior and maltreatment of their children has severely influenced the children's development.' [¶] . . . Here I have evidence from mental health professionals that return, even visitation in an unsupervised setting, would be detrimental to these minors, and that in fact, if that's the case, then clearly return is even more detrimental. And it's that lack of appreciation of the impacts of the previous abuse and neglect. [¶] I think this is a case where the Court can, should, and in fact I do, make the finding that there is a preponderance of the evidence that return of these children would create a substantial risk of detriment, at the very least to the emotional well-being of these minors."

The court concluded: "I will find that return of the minors to their parents would create a substantial risk of detriment to the minors, the factual basis being, it's not the failure to complete the reunification plan, the mother is very close to having it completed, if not completed, the father is not quite

there, but it's basically the finding from Dr. Glickman's report that the parents have a very limited awareness of both the emotional and physical needs of their children and they do not recognize how their past behavior and maltreatment of their children has influenced the children's development; and, without that understanding and with the inability to clearly see the situation, that it would be detrimental to return these children.

"By clear and convincing evidence, I find that reasonable efforts and services directed toward reunification have been provided or offered to the parents. [¶] The parents have made substantial progress in complying with the case plan but have not alleviated or mitigated the causes necessitating placement of the children in out-of-home care. [¶] By clear and convincing evidence, I find the minors are not adoptable and there's no one to assume legal guardianship. The minors are to remain in long-term foster care. [¶] . . . I am going to go ahead and terminate the reunification services. I just do not believe that if I continue them for another six months, that we would be in any different situation in six months than we are now."

On April 18, 1996, mother filed a timely notice of appeal.

### DISCUSSION

■ Mother appeals from the order terminating family reunification services and placing the children in long-term foster care. She contends this order is appealable under section 395, because unlike an order setting a hearing under section 366.26 which is interlocutory, an order regarding long-term foster care is final and appealable. (*In re John F.* (1994) 27 Cal.App.4th 1365, 1374, fn. 4 [33 Cal.Rptr.2d 225].) The court in *In re John F.* explained: "[W]e distinguish between orders contemporaneous to an order setting a section 366.26 hearing, and orders, such as this, that bypass the section 366.26 hearing and select long-term foster care as the minor's permanent plan. The latter are final and appealable under section 395 as orders subsequent to a judgment of dependency because nothing further is required to establish the permanent plan." (*Ibid.*)

■ Mother does not argue SSA failed to prove the return of the children would create a substantial risk of detriment to them; nor does she contend SSA failed to provide adequate reunification services. Instead, the only issue she raises is whether the juvenile court failed to consider the parents' completion of the reunification plan, and thus erred.

Mother acknowledges the court, "at the 18-month hearing, shall order the return of the minor to the physical custody of his or her parent or guardian

unless the court finds, by a preponderance of the evidence, that the return of the minor to his or her parent or guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the minor. . . ." (§ 366.22, subd. (a).) However, the court must also "consider the efforts or progress, or both, demonstrated by the parent or guardian and the extent to which he or she availed himself or herself of services provided . . . ." (*Ibid.*) She contends the court failed to consider her completion of the reunification plan, and by only considering the detriment to the children, ignored the legislative purpose of section 202, subdivision (a), which stresses the importance of preserving and strengthening the "minor's family ties whenever possible." (See also *In re Jasmon O.* (1994) 8 Cal.4th 398, 419 [33 Cal.Rptr.2d 85, 878 P.2d 1297] [California has a policy of "family preservation"].)

Mother contends the juvenile court here followed *In re Joseph B.* (1996) 42 Cal.App.4th 890 [49 Cal.Rptr.2d 900]; which, she contends, is bad law. She asserts this juvenile court, like the Court of Appeal in *In re Joseph B.*, failed to consider "the law's strong support for preservation of the parent-child relationship, even in the face of dangerous parental misconduct" (*In re Kieshia E.* (1993) 6 Cal.4th 68, 79 [23 Cal.Rptr.2d 775, 859 P.2d 1290]). The juvenile court, she maintains, ignored her completion of the reunification plan when it found: "There's another very recent case, In re Joseph B., . . . . That was a case where basically the parent completed the reunification plan and the Court felt compelled to return the children because of completion of the reunification plan, as I recall it. [¶] . . . [¶] *The focus of the finding is not on the parent. The focus of the finding is on the minor and will there be detriment to the minor by return of the child to the parent.*"

Mother criticizes the court's finding and asserts: "It would certainly be inappropriate to interpret a statute which mandates services to be provided to the children and the parents 'for the purpose of facilitating reunification of the family' (§ 361.5, subd. (a)), particularly in this statutory scheme, to be merely a show of assistance and fairness masking a system which amounts to little more than spending taxpayer money to offer services that result in nothing for the family, putting the parents through hoops and making courts order such plans just to see if the parents will comply; and then, when they do, saying 'sorry; it didn't mean anything anyway.' "

Notwithstanding mother's impassioned argument to the contrary, neither the Court of Appeal in *In re Joseph B.* nor the juvenile court in this case proposes that the court should completely discount the parents' compliance with the reunification plan when making a determination under section 366.22, subdivision (a). We agree with other courts which have held compliance with the reunification plan need not be the sole concern of the court,

but it must be an indicium of progress toward family preservation (see *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1790 [42 Cal.Rptr.2d 200]).

The Court of Appeal in *In re Joseph B.* held that deciding whether to return a dependent child to parental custody is not governed *"solely* by whether the parent has corrected the problem that required court intervention . . . ." (*In re Joseph B., supra*, 42 Cal.App.4th 890, 901, italics added.) In *In re Joseph B.,* the minor was removed from the home because of physical abuse. The parents had completed the reunification plan, but the minor did not want to return home and the court found returning the minor detrimentally impacted the child's emotional well-being. The court found the "detriment was a manifestation of the original basis for dependency: the minor's substantial emotional trauma was caused by the physical abuse he received . . . and by his fear of further physical abuse if he returned to her custody." (*In re Joseph B., supra*, at p. 903.)

Mother contends the court in *In re Joseph B.* disregarded the policy of family preservation partially because it eschewed the holding in *In re Venita L.* (1987) 191 Cal.App.3d 1229 [236 Cal.Rptr. 859] (overruled on other grounds in *In re Jasmon O., supra*, 8 Cal.4th 398, 421) by dismissing it because it was based on an outmoded statutory scheme. The court in *In re Venita L.* held a court may refuse to return the child to the family only if the detriment to the child would be sufficient to sustain a new jurisdiction finding based on that detriment. However, the court in *In re Joseph B.* did not simply ignore the holding in *In re Venita L.*; but rather, it distinguished itself from *In re Venita L.* Unlike the facts in *In re Joseph B.,* the risk of detriment found at the review hearing in *In re Venita L.* differed from the risk of harm which served as the original basis for dependency. Thus, *In re Joseph B.*'s holding applies only when the risk of detriment at the 18-month hearing was caused by the parent's actions leading to the out-of-home placement.

Mother complains: "If the [*In re Joseph B.*] opinion is allowed to stand as the rule of law for interpreting this provision of section 366.22, then parents and children will be routinely denied reunification based on problems the parents have which have never been addressed by the juvenile court until the parents have completed the entire reunification plan and then find their parental rights terminated in spite of their successful efforts to overcome the cause of the dependency." However, this is not true. As already explained, *In re Joseph B.* does not permit the court to raise new issues at the 18-month review hearing. Instead, it specifies the narrow circumstances which may not result in returning the child to the home even though the parents did remedy the problem(s) requiring out-of-home placement.

In this case, mother complains the children were removed from the home because of physical abuse, but the court refused to return them because it found the parents could not meet the children's emotional needs. This was despite the court's finding she had complied with the reunification plan. Thus, she asserts she was essentially sandbagged with new requirements at the 18-month review hearing.

Mother, however, is less than candid in her interpretation of the record and the court's findings. The objectives of the reunification plan clearly related to mother's understanding and appreciation of the significance of father's physical abuse and the particular psychological problems her children had as a result of that abuse. One of the provisions of the reunification plan (interestingly only listed in a footnote in her brief with a comment explaining it was not mentioned in the body of her argument because the provision did not require her to do anything) required the treating therapists to prepare a report addressing, among other things, the parents' ability to protect and provide adequately for the minors and the parents' ability to provide adequately for the *emotional* and physical well-being of the minors. Thus, the parents' capacity to meet the emotional—as well as the physical —needs of the children, was clearly an objective of the reunification plan.

Additionally, at the 12-month review hearing, the SSA report admonished the parents about their failure to meet the goals of the reunification plan. In March 1995, about five months prior to the twelve-month review hearing, Dye expressed concern about mother's inability to perceive anything unusual about her husband's behaviors. The therapist's evaluations of the father's behavior aroused greater concern: Dye reported father could not address his own needs and his interactions with his children should be closely supervised. Glickman concluded the parents as a unit appeared to have a very limited awareness of the needs of their children and their visits should be supervised by "a professional who is aware of appropriate and inappropriate behavior on the part of the parents regarding their children."

Mother's argument seems to suggest the mere completion of the technical requirements of the reunification plan—such as attending counseling sessions and visiting her children—is sufficient. Availing herself of the services provided is one consideration under section 366.22, subdivision (a), but under this statute the court must also consider progress the parent has made

towards eliminating the conditions leading to the children's placement out of home.

In mother's brief, she essentially ignores the portion of the court's decision which clarifies it found she had not met the objectives of the plan and had not sufficiently ameliorated the conditions giving rise to the jurisdictional hearing. The juvenile court stated: "I will find that return of the minors to their parents would create a substantial risk of detriment to the minors, the factual basis being, it's not the failure to complete the reunification plan, the mother is very close to having it completed, if not completed, the father is not quite there, but it's basically the finding from Dr. Glickman's report that the parents have a very limited awareness of both the emotional and physical needs of their children and they do not recognize how their past behavior and maltreatment of their children has influenced the children's development; and, without that understanding and with the inability to clearly see the situation, that it would be detrimental to return these children. [¶] . . . [¶] The parents have made substantial progress in complying with the case plan but have not alleviated or mitigated the causes necessitating placement of the children in out-of-home care."

The latter part of the court's findings makes it clear the facts of this case did not resemble those in *In re Joseph B.*—where the parents had corrected the problem causing court intervention. The juvenile court here did follow the mandate of section 366.22, subdivision (a): It considered the efforts and *progress* of the parents towards remedying the causes requiring out-of-home care as well as their cooperation in availing themselves of the services provided.

Finally, mother urges us to impose the following rules: "1) The basic rule should be that if a parent successfully completes the reunification plan ordered, it should be treated as a reunification plan and mean that reunification results. This requires the county and the juvenile court to be careful [and] to heed the mandate of the appellate courts that reunification plans must be tailored to the specific needs of each family. (*In re Basilio T.* (1992) 4 Cal.App.4th 155, 172 [5 Cal.Rptr.2d 450].) [¶] 2) The companion rule, . . . is that, where a reunification plan is proving to be ineffective, it must be amended promptly [under section 342], to ensure that it becomes a true reunification plan." The latter would comply with the requirement that the reunification plan " 'must be specifically tailored to fit the circumstances of each family [citation], and must be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding.' " (*In re Precious J.*

(1996) 42 Cal.App.4th 1463, 1474 [50 Cal.Rptr.2d 385], citing *In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777 [8 Cal.Rptr.2d 416].)

We find no merit to mother's proposal. As we have already stressed, simply complying with the reunification plan by attending the required therapy sessions and visiting the children is to be considered by the court; but it is not determinative. The court must also consider the parents' progress and their capacity to meet the objectives of the plan; otherwise the reasons for removing the children out-of-home will not have been ameliorated. We already have rules in place to address the situation where the juvenile court finds it detrimental to return the minors to the home despite the parents' achieving the plan's objectives. In the latter case, as long as the situation does not fall into the narrow exception created by *In re Joseph B.,* the reunification plan would probably not be reasonable and the parents could mount a challenge on that basis.

Accordingly, we find the juvenile court did properly assess the parents' failure to meet the objectives of the reunification plan and we affirm.

Kline, P. J., and Haerle, J., concurred.

A petition for a rehearing was denied May 30, 1997, and the opinion was modified to read as printed above.