Filed 3/7/22  In re Layla R. CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re LAYLA R., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>DIANA S.,<br><br>     Defendant and Appellant. | A162649<br><br>(Sonoma County<br>Super. Ct. No. DEP-5732-01) |

After an 18-month review hearing, the juvenile court found that five-year-old Layla R. was at substantial risk of detriment if returned to her mother's custody.  (Welf. & Inst. Code, § 366.22, subd. (a)(1).)[1]  Diana S. (Mother) appeals from that order, challenging the sufficiency of the evidence to support the juvenile court's finding.  We affirm.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

## BACKGROUND

### A.

Layla is the youngest of Mother's four children. Mother's oldest son is an adult. Mother's two middle children (J. and C.) are also dependents of the juvenile court but are not subject to the challenged order.

In late 2018, it was reported that Mother failed to protect J. from sexual abuse at the hands of multiple perpetrators—including J.'s older sibling (in 2010), an adult family member (in 2013 and 2016), and Mother's 49-year-old roommate (in 2018). Mother did not report to law enforcement her knowledge that her roommate was having an ongoing sexual relationship with then 15-year-old J. Nor did she make efforts to restrict any of the perpetrators' access to J.

It was also reported that Mother neglected the children's medical, mental health, safe housing, and educational needs. C. frequently complained of being hungry and was often sent to school without lunch. When social workers inspected Mother's home, it was observed to be dirty, dilapidated, and without electricity. Mother's roommate's bedroom contained unsecured pellet guns that were accessible to the children. The home was condemned.

The Sonoma County Human Services Department (Department) filed a dependency petition on behalf of Layla, pursuant to section 300, subdivisions (b)(1) and (j). The Department alleged that Layla was at substantial risk of serious physical harm due to Mother's substance abuse, neglect, and unsafe living conditions. It was further alleged that Layla was at substantial risk of being abused or neglected because Mother failed to protect J. from sexual abuse.

The Department noted, in its detention report, that it had received nine referrals involving the children over the course of

2

10 years, and had initiated a voluntary family maintenance case a few years earlier.

J. had not regularly attended school for years. C. also missed significant amounts of class time and did not have enough to eat. Even though two-year-old Layla had not begun talking, Mother had not taken her to the doctor in more than a year.

Mother had an admitted history of substance abuse and was initially referred to a residential treatment program, where the children could have lived with her. However, Mother was terminated from the program because she minimized both her substance abuse, as well as the neglect and abuse her children suffered.

At the detention hearing, Layla was detained and placed in foster care.

**B.**

The social worker noted, in the Department's jurisdiction report, that Mother believed it was "a good thing" that J. was having sex with adult men because J. "was happier and not trying to kill herself." Mother admitted most of the petition's additional allegations. However, she denied having an active substance abuse problem. Family members reported that Mother repeatedly left Layla unsupervised. Believing mental health challenges could be causing some of the family's problems, the social worker asked that a psychological evaluation be ordered for Mother.

In the disposition report, the social worker reported Layla had speech delays, trouble maintaining eye contact, and attachment challenges that manifested in tantrums, biting, and hitting. Layla was referred to therapy and developmental services. With more structure and routine, her behavior improved. Mother was appropriate, loving, and affectionate with

3

Layla during their supervised visits. Layla was always happy to see her.

At the combined jurisdiction/disposition hearing, the juvenile court sustained the Department's amended petition, declared Layla a dependent of the juvenile court, and ordered her removed from Mother's custody. The juvenile court also adopted the Department's case plan, which, among other things, required Mother to: (1) engage in individual therapy; (2) complete a psychological evaluation; (3) complete a parenting class and sexual abuse education; (4) maintain sobriety, drug test, and complete a substance abuse treatment program; and (5) safely and appropriately parent her children.

## C.

The Department's six-month review report indicated Mother was employed full-time, had completed a parenting class, and was engaged in an outpatient "relapse prevention" treatment program. She was regularly testing (negative) for all substances and completed her psychological evaluation.

Mother's psychological evaluation recommended therapy, as well as one-on-one parent coaching to address her "significant denial" and minimization. Mother's therapist noted that their progress was slowed because Mother "is still fighting the allegations and will not admit any responsibility."

Mother consistently visited Layla. Their visits had progressed to "lightly supervised" and continued to be appropriate. Layla was excited for their visits and showed a connection to Mother.

Now in her third foster home, Layla's speech was improving with speech therapy and preschool. Her behavioral challenges were also subsiding. Layla had been diagnosed with "mild autism," as well as post-traumatic stress disorder and attachment issues, which "magnified" her autism. Although

4

Layla was 30 months old at the time of her assessment, her language skills were in the six- to nine-month developmental range. Layla's autism assessment also noted that "transitions are hard for her."

The Department recommended continuing Mother's reunification services. However, the Department warned that Mother's denial that neglect and abuse occurred in her home was a barrier to reunification. Mother was also instructed to complete autism parenting education.

At the six-month review hearing, the juvenile court found Mother made "significant progress" on resolving the underlying issues and ordered an additional six months of services.

### D.

The Department's 12-month review report observed that Mother continued working hard on her case plan and had "move[d] closer to having her children returned to her care." In particular, she completed a relapse prevention treatment program; complied with drug testing; remained employed; worked on obtaining long-term housing; completed another parenting class; and consistently attended therapy with two therapists (one focused solely on sexual abuse issues).

Given Mother's consistently negative test results, the social worker wrote that she had "no concerns" about current substance use. Because Mother had not started any autism education, the social worker was concerned Layla would not receive necessary services if returned to Mother's care.

Mother had begun unsupervised visits with Layla. The social worker was concerned that Mother allowed her new boyfriend to attend at least two visits without alerting the Department. Mother also did not see any issue with having Layla's father help with childcare and transportation, despite his

failure to participate in services. However, the social worker did not recommend returning to supervised visits.

Layla remained happy and engaged during visits. But she began to struggle with the related transitions. During and after visits, Layla complained of injuries and stomach pain. She also vomited, attempted to make herself vomit, and experienced night terrors. Nonetheless, the Department asked the juvenile court to authorize a trial home visit.

The Department remained concerned about Mother's ability to protect Layla. Despite her engagement in therapy, Mother continued to minimize her role in the dependency. At the 12-month review hearing, the court found Mother had made "significant" progress and followed the Department's recommendation to continue services for an additional six months.

**E.**

The 18-month review hearing was continued after COVID-19 emerged and shelter-in-place orders impacted Mother's ability to progress with reunification. Ultimately, the Department recommended terminating Mother's reunification services.

After an unsupervised visit with Mother in February 2020, Layla's foster parents reported that her ankle and hand were swollen. Until the injury was determined to be accidental, Mother's visits reverted to "lightly supervised." During a visit the next month, Layla complained of arm pain. An emergency room doctor observed no injury and said Layla appeared to be suffering a "psychosomatic stress response."

Between March of 2020 and July of 2020, Layla's and Mother's visits were virtual. When in-person visits resumed, Layla appeared happy and engaged. However, on one occasion, Layla reportedly cried, begged not to attend, and refused to get out of her foster parents' car. After in-person visits, Layla also

vomited, cried uncontrollably, regressed to baby-like behavior, and withdrew. The social worker attributed this was caused, at least in part, by the pause in personal contact required by the shelter in place order.

Although no effort had been made to address Layla's somatic responses through joint therapy with Mother, Layla was referred to an individual play therapist. Layla's therapist, Linda Ibitz, stated that Layla's responses to visits were indicative of a severe stress response. Ibitz also opined that Layla's severe developmental delays were consistent with her autism diagnosis, but also indicated significant neglect occurred prior to age three.

Mother continued to be employed full-time and had moved into her own home, in a neighboring county. She also continued to attend therapy (virtually) during this period. One therapist reported Mother had recently opened up. But both therapists stated Mother remained hesitant to discuss J.'s sexual abuse. Mother only talked about a recent inappropriate incident— involving C. acting out sexually against his foster mother—when pressed to do so. One therapist believed Mother's hesitancy was an indicator that "if [Layla] returned to her care, there would be a recurrence of abuse."

In November 2020, Layla's therapist completed a report documenting her observations after attending one visit with Mother and watching several videos of Layla taken (by the foster parent) before visits. In the videos, Layla begged not to attend visits and then would shut down and become very quiet. Ibitz recommended terminating visits because prolonged exposure to such an overwhelming amount of distress could have long-term mental health consequences for Layla. Accordingly, the Department recommended terminating Mother's visits.

Around the same time, a social worker observed one of Mother's and Layla's visits—at the request of Mother's counsel. The social worker opined that Mother was appropriate, that

7

Layla seemed to have a good time, and that, with the exception of a very brief period on arrival, Layla did not appear anxious. Mother, who Layla called "momma Diana" handled the transition well.

## F.

The contested 18-month review hearing occurred over a series of dates between December 2020 and March 2021.

Mother's primary therapist testified that Mother was originally guarded in therapy but ultimately made progress on all of her therapeutic goals. She demonstrated responsibility by acknowledging that her drug use caused her to neglect her children. Mother also now acknowledged that she missed the signs of sexual abuse, regretted it, and felt guilt and shame. Mother improved her parenting skills by learning how to set boundaries and how to create structure and routine. Mother also developed a safety plan for Layla's return home. In short, Mother "turned her whole life around."

The social worker who supervised visits (in 2019) testified that these early visits went well, transitions were smooth, and that Layla was not afraid of Mother. However, when supervised in-person visits resumed in 2020 after the pause necessitated by COVID-19, Layla became tentative at the beginning of visits and excited to go home with her foster mother.

Layla's pediatrician testified that an x-ray of Layla's ankle showed a "growth recovery line[]," which purportedly demonstrated Layla's recovery from a period of stunted growth. The pediatrician did not know when any stunted growth occurred and acknowledged that Layla's height and weight were both above average five weeks after Layla entered foster care.

Dr. Jacqueline Singer testified, as an expert, that Layla's somatic responses were not caused by Mother doing anything objectionable during visits. Dr. Singer opined that Layla began

experiencing somatic stress, around December 2019 or January 2020, due to the stress of trying to reconcile two maternal figures. Dr. Singer also opined that Layla's stress symptoms were due to the interruption caused by COVID-19, including social distancing rules that prevented Layla from having physical contact with Mother even after in-person visits resumed. On cross-examination, Dr. Singer testified that Layla's somatic stress responses were also triggered by having suffered past trauma in Mother's care.

Dr. Singer believed that parent-child therapy would assist Mother and Layla by allowing them to process Layla's traumatic experiences together. Dr. Singer believed that it would be harmful for Layla to return to Mother's care right away, but opined that with increased contact (and therapy) Layla could develop a sense of security in the relationship. Dr. Singer opined that such therapy should have begun much earlier in this case— ideally when Layla first experienced difficulty around visits.

The social worker confirmed that the Department had not provided Mother an opportunity for therapy with Layla. The Department reached out to several local parent-child interaction therapists in November 2020, at Mother's counsel's request. One therapist had been available, but the Department did not move forward because it was concerned about the safety of in-person therapy and that therapy could quickly end if the case did not move towards reunification.

Mother's home was deemed safe when it was inspected in January 2021. However, Mother's visits remained supervised because she had been observed violating social distancing protocols during visits—for instance, by blowing bubbles with Layla and picking her up.

The social worker testified that the Department recommended terminating Mother's reunification services because it believed that Mother had not met her reunification

9

goals and was not in a position to keep Layla (who is particularly vulnerable) safe. The social worker considered it especially troubling that Mother did not reach out for help in addressing the sexual issue that arose with C. The social worker also believed the discovery of the growth recovery line on Layla's ankle was important.

Mother testified that she last used drugs in 2018 and that sobriety changed her life. She now had new resources and support. Mother also gained insight into her need, as a parent, to provide structure and boundaries. She also realized that her drug use had caused her to neglect her home and children. She recently completed a parenting course on autism spectrum disorder and understood that Layla and C. could never be alone together.

Mother admitted it had been difficult to keep Layla engaged during virtual visits. When their visits resumed in-person, near the Department's parking lot, Layla seemed confused when a social worker told her that she could not sit in Mother's lap due to COVID-19. Visits were solely virtual again between December 2020 and February 2021.

Layla's therapist, Ibitz, testified that she had not reviewed any of the Department's reports or visitation notes before writing her earlier report to the court. As a result, Ibitz was unaware that, during the first six months of reunification, Layla had been very excited to see Mother at visits. This did not change Ibitz's opinion that it was detrimental for Layla to continue visiting Mother because Layla repeatedly entered a dissociative state to escape the associated stress. Long-term exposure to such stress responses could make Layla prone to mental health challenges as an adult.

Ibitz also believed that it would be too traumatic for Layla to participate in parent-child therapy with Mother. Joint therapy was not appropriate, according to Ibitz, because Mother severely

10

neglected Layla in the past. Ibitz based her opinion—that Mother severely neglected Layla—on the significant developmental delays reflected in Layla's autism assessment reports. Ibitz believed severe neglect was involved because Layla's autism alone would not have caused such significant developmental delays.

## G.

Layla's counsel joined the Department's recommendation to terminate reunification services and set a section 366.26 hearing. Mother's counsel objected to that recommendation, and asked for Layla to be returned to Mother's custody—with supportive therapy and a long transition plan. In the event that Layla was not immediately returned to Mother's custody, Mother's counsel argued for an extension of reunification services.

The juvenile court found Mother "substantial[ly]" met her case plan objectives, and that return of Layla to Mother's custody would be detrimental because of Layla's "severe" somatic responses while transitioning to and from visits. Otherwise, the court concluded that the Department had not met its burden to show detriment, rejecting the social worker's view that Mother failed to gain sufficient insight to protect Layla.

Finding the Department failed to offer reasonable services to address Layla's somatic responses, the juvenile court extended services for six months. It ordered the Department to provide therapeutic visits for Mother and Layla with a neutral therapist. The court denied the Department's request to find continued visitation between Mother and Layla detrimental. However, the court ordered Mother's visits temporarily suspended until a therapeutic setting was found.

11

## A.

Mother maintains the Department did not meet its burden to prove that Layla faced a substantial risk of detriment if returned to Mother's custody.  We disagree.

### 1.

At the 18-month review hearing, the juvenile court must order a child returned to her parent's custody unless it finds, by a preponderance of the evidence, that "return of the child . . . would create a substantial risk of detriment to the safety, protection, or physical or *emotional* well-being of the child."  (§ 366.22, subd. (a)(1), italics added.)

"The standard for showing detriment is 'a fairly high one.  It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.'  [Citation.]  Rather, the risk of detriment must be *substantial*, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being.  [Citations.]  [¶] In evaluating detriment, the juvenile court must consider the extent to which the parent participated in reunification services.  [Citations.]  The court must also consider the efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement."  (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400; accord, § 366.22, subd. (a)(1).)

We review a juvenile court's detriment finding for substantial evidence.  (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.)

**2.**

Mother contends the sole basis for the juvenile court's detriment finding is legally insufficient because Layla's somatic stress responses were purportedly not caused by Mother's actions that led to Layla's detention.

In assessing detriment, a number of factors are considered. The parent's compliance with the case plan is one important consideration. (*Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1341 (*Jennifer A.*).) But compliance with a court-ordered reunification plan does not guarantee return of the child. (*Ibid.*; *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143 (*Dustin R.*); *In re Joseph B.* (1996) 42 Cal.App.4th 890, 901 (*Joseph B.*).)

There are other factors, including the parent's progress toward remedying the circumstances that led to the child's removal. (*Jennifer A.*, *supra*, 117 Cal.App.4th at p. 1344.) Another key consideration is the impact that return to the parent's custody would have on the child's emotional well-being. (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705 [even if parent has fully complied with reunification plan, juvenile court may consider "properly supported psychological evaluations which indicate return to a parent would be detrimental to a minor"]; *Joseph B., supra,* 42 Cal.App.4th at pp. 894, 901.)

Here, the juvenile court found that Mother substantially complied with the requirements of her reunification plan. Accordingly, there was no "prima facie evidence that return would be detrimental." (§ 366.22, subd. (a)(1).) However, the juvenile court's finding—that Layla is at substantial risk of emotional harm—is supported by undisputed evidence that Layla displayed considerable anxiety—expressed somatically—before and after visits with Mother. Both Ibitz and Dr. Singer testified that returning Layla to Mother's custody in these circumstances

13

would be detrimental to Layla's emotional wellbeing. The juvenile court agreed.

These facts are similar to those presented in *Joseph B.*, *supra*, 42 Cal.App.4th 890. In that case, the child was removed from his parents' custody due to physical abuse, pursuant to section 300, subdivisions (a) and (b). (*Joseph B., supra*, at p. 893.) By the time of the 18-month review hearing, the child's mother had sufficiently addressed that issue and the child was no longer at substantial risk of physical harm. The juvenile court noted that the child was nonetheless anxious and afraid of his mother, but concluded it could not ground its detriment finding on that evidence because the child had not been removed for emotional harm pursuant to section 300, subdivision (c). (*Joseph B.,* at pp. 897-898.)

The *Joseph B.* court reversed, holding that "placement must continue regardless of whether that detriment mirrors the harm which had required the child's removal from parental custody." (*Joseph B., supra*, 42 Cal.App.4th at p. 900.) The court reasoned: "By authorizing the continued removal of a child from parental custody based on the risk of either physical detriment or emotional detriment, sections 366.21 and 366.22 focus on the child's well-being *at the time of the review hearing* rather than on the initial basis for juvenile court intervention. [Citation.] Thus, while the court must consider the extent the parent has cooperated with the services provided and the efforts the parent has made to correct the problems which gave rise to the dependency (§ 366.22, subd. (a)), the decision whether to return the child to parental custody depends on the effect that action would have on the physical or emotional well-being of the child." (*Joseph B., supra*, at p. 899, italics added.)

Mother suggests that *Joseph B.* is distinguishable because the juvenile court, in that case, expressly found that the emotional detriment it relied on "*was a manifestation of the*

*original basis for dependency: the minor's substantial emotional trauma was caused by the physical abuse he received from* [his mother] and by his fear of further physical abuse if he returned to her custody." (*Joseph B., supra,* 42 Cal.App.4th at p. 903, italics added.) We assume, without deciding, that the *Joseph B.* holding applies "only when the risk of detriment at the 18-month hearing was *caused* by the parent's actions leading to the out-of-home placement" and does not permit a court to raise wholly "new issues" at the 18-month review hearing. (*Dustin R., supra,* 54 Cal.App.4th at p. 1140, italics added.) According to Mother, no such link exists in this case. We disagree.

The record may not support a finding that Layla's somatic stress responses were caused by anything Mother did *at visits.* But Dr. Singer testified, on cross-examination, that Layla's somatic stress responses were triggered by having suffered past trauma (neglect) in Mother's care.[2] This alone is substantial evidence to support the order. Moreover, the fact that Layla may also experience somatic stress in situations other than when she is visiting Mother—such as in respite care—does not mean that there is no causal link to Mother's neglect. It might simply mean, as Dr. Singer suggested, that Layla's separation from her foster parents reminds her of that past trauma.

Dr. Singer also testified that Layla's somatic responses were caused, in part, by confusion relating to her mixed allegiances to two maternal figures—Mother and her foster mother. This circumstance is also linked to Mother's neglect. Were it not for Mother's neglect, Layla would not have been placed in a foster home.

---

[2] We accept, as we must, the juvenile court's finding that Dr. Singer's expert testimony was more credible and persuasive than Ibitz's. (See *In re R.T.* (2017) 3 Cal.5th 622, 633 [juvenile court resolves issues of fact and credibility].)

Mother is no doubt correct that other factors—such as Layla's autism and pandemic-related social distancing—exacerbate Layla's emotional reaction to visits. However, we are aware of no authority that suggests the presence of these other factors somehow negates the juvenile court's (otherwise supported) detriment finding. In any event, the record is clear that Layla was diagnosed with post-traumatic stress disorder and noted to have attachment challenges, in addition to autism spectrum disorder, long before the pandemic began—suggesting that her somatic responses to visits cannot be so easily explained.

Substantial evidence supports an implicit finding that Layla's anxiety was caused, at least in part, by the neglect that led to Layla's removal from Mother's custody. (See *Dustin R., supra,* 54 Cal.App.4th at p. 1140.)

**3.**

We similarly reject Mother's related argument that a slow transition to her home, along with family maintenance services, could have adequately ensured Layla's safety. As we described in more detail above, there is substantial evidence in the record to support the juvenile court's finding that this could not be safely accomplished—especially given Layla's extreme vulnerability. Mother's own expert believed it would be harmful for Layla to return to Mother's care right away.

The juvenile court did not leave Mother without options to address the new harm Layla was suffering. Rather, it properly ordered additional reunification services, specifically joint therapy, to improve the parent-child relationship and address Layla's somatic issues. (See *Jennifer A., supra*, 117 Cal.App.4th at pp. 1344-1345; *Dustin R., supra*, 54 Cal.App.4th at p. 1143.)

Mother's participation in court-ordered services and progress on the overall objectives of her reunification plan are commendable. However, substantial evidence nonetheless

16

demonstrates a substantial risk of detriment to Layla if she were returned to Mother's custody. Faced with this dilemma, the trial court made a reasonable decision to treat Layla's serious emotional issues with the goal of avoiding further harm to the child and reunifying her with Mother. We believe the court had a sound basis for doing so.

## DISPOSITION

The challenged 18-month review order is affirmed.

_____
BURNS, J.


We concur:


_____
SIMONS, ACTING P.J.


_____
NEEDHAM, J.


A162649


18