Filed 2/14/23  Jocelyn A. v. Superior Court CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JOCELYN A.,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF MERCED COUNTY,<br><br>    Respondent;<br><br>MERCED COUNTY HUMAN SERVICES AGENCY,<br><br>    Real Party in Interest. | F085259<br><br>(Super. Ct. No. 21JP-00022A)<br><br><br>**OPINION** |

## THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Donald J. Proietti, Judge.

Jocelyn A., in pro. per., for Petitioner.

No appearance for Respondent.

Forrest W. Hansen, County Counsel, and Jeffrey B. Grant, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]     Before Poochigian, Acting P. J., Detjen, J. and Meehan, J.

Petitioner Jocelyn A. (mother), in propria persona, seeks an extraordinary writ (Cal. Rules of Court, rules 8.450–8.452),[1] from the juvenile court's orders issued at a contested 18-month review hearing (Welf. & Inst. Code, § 366.22, subd. (a)(1))[2] terminating reunification services and setting a section 366.26 hearing as to her now three-year-old son, Josiah G.-A. Mother seeks Josiah's return to her custody. Alternatively, she seeks continued reunification services and more than one visit a month.[3] Pending our review of her petition, she requests that we stay the section 366.26 hearing. We conclude substantial evidence supports the juvenile court's finding it would be detrimental to return Josiah to mother's custody, and its order terminating reunification services. We further find no abuse of discretion in the frequency of visitation ordered by the court. We thus deny mother's writ petition and her request for a stay of the section 366.26 hearing.

## PROCEDURAL AND FACTUAL SUMMARY

*Josiah Detained*

In March 2021, law enforcement placed then one-year-old Josiah and his then three-month-old brother, Jeremiah, (collectively the children) into protective custody and turned the children over to the Merced County Human Services Agency (agency) after conducting a welfare check on mother and the children and observing mother's bizarre

---

[1]    Rule references are to the California Rules of Court.

[2]    Statutory references are to the Welfare and Institutions Code.

[3]    Real party in interest argues the petition should be summarily denied because it does not provide a summary or argument of why the juvenile court's ruling was erroneous, or citation or reference to significant facts to support a claim or claims of error as required by rule 8.452. We recognize mother's petition does not technically comply with the rule. However, we are also mindful that a parent appearing in propria persona is not trained in the law. We are equally mindful that the rule directs us to liberally construe petitions in favor of their sufficiency. (Rule 8.452(a)(1).) Thus, we decline to summarily deny mother's petition on technical grounds. Instead, we construe the petition to challenge the juvenile court's finding of detrimental return and its orders terminating reunification services and establishing once monthly visitation.

and delusional behavior. She believed that a furniture store was operating a child sex trafficking ring by putting children in their furniture boxes and shipping them to individuals who trafficked children. Josiah did not have any marks, bruises or injuries. However, mother's residence was dirty and messy and smelled like vomit and soiled clothing. Several days before, mother was in San Jose with the children without money, food, or a place to stay, and was noted to be speaking in a bizarre manner. Josiah had a heavily soiled diaper and mother had no extra diapers or clean clothes. In late February 2021, the agency received a referral mother verbally abused Josiah and locked him out of the bedroom where she was with Jeremiah. Josiah was found outside on multiple occasions. On one occasion he was naked. Mother did not change Josiah's diapers or feed him. He walked around with sagging diapers and a foul smell and tried to eat pizza out of the garbage.

The juvenile court ordered the children detained pursuant to a dependency petition filed by the agency alleging the children were described under section 300, subdivision (b) (failure to protect). The agency placed Josiah in foster care and Jeremiah with his father, S.G. In its jurisdiction/disposition report, the agency recommended the juvenile court allow Jeremiah to remain in S.G.'s custody and dismiss its dependency jurisdiction.

*Mother Provided Reunification Services*

At an uncontested jurisdictional hearing on April 15, 2021, the juvenile court adjudged the children dependents as alleged in the petition, ruled on disposition as to Josiah, ordering reunification services for mother and Alexis C., Josiah's father, and set a six-month review hearing for September 30, 2021. The court ordered supervised visits to occur no less frequently than once a month. The juvenile court set a contested dispositional hearing for May 11, 2021, regarding Jeremiah because mother objected to the court placing Jeremiah with S.G. and dismissing dependency jurisdiction. Although the appellate record does not contain the minute order or reporters' transcript for a

3.

hearing on May 11, 2021, it appears the juvenile court followed the agency's recommendation.[4]

By the six-month review hearing, Josiah had been placed with his paternal grandparents. Mother and Alexis were living together in San Jose and were employed. They rented a room equipped with a bed, refrigerator, and small closet space in a house. They had to enter the main home to use the bathroom and kitchen. They reported being roommates rather than romantic partners and planned to remain roommates and co-parent Josiah if he were returned to their care.

Mother was participating in her parenting classes but struggled to prioritize her time during her weekly visits with Josiah, opting instead to spend time on her cell phone. On one occasion, she called law enforcement during a visit to report her ex-boyfriend, who she claimed was harassing her. She completed a mental health assessment through Merced County Behavioral Health and Recovery Services and did not meet their criteria for treatment. She began individual counseling in August 2021 through the Christian Counseling Center in San Jose. However, the agency reported that she could be unstable and emotional. She insisted, for example, that the social worker that detained the children made " 'false allegations' " against her and used digital photo editing on the pictures taken of her home. She claimed the house was never dirty and her room was always clean. Alexis was attending parenting classes and was appropriate during visitation. He was loving and affectionate with Josiah and knew how to redirect him when he was misbehaving.

---

[4]     There are no minute orders in the record subsequent to the jurisdictional hearing on April 15, 2021, identifying Jeremiah as a subject of the proceedings. Further, in an addendum report filed in August 2022, mother questioned why Jeremiah's case was "closed."

*Mother's Reunification Services Continued to the 18-Month Review Hearing*

The six-month review hearing was continued and conducted on November 2, 2021. The juvenile court continued reunification services for mother and Alexis to the 12-month review hearing, originally set for March 24, 2022, but continued and conducted on May 5, 2022.

In its report for the 12-month review hearing filed on April 27, 2022, the agency recommended the juvenile court continue reunification services for mother and Alexis. They lived together in a two-bedroom apartment. Alexis was working as an electrician in Alameda and mother was a full-time student in a private institution learning stock trading and was also enrolled in an eyelash technician certification course. Mother reported she and Alexis were in love but were taking their relationship slowly. Alexis reported they were not in a relationship but was unsure of how that might change.

Mother completed her biweekly individual counseling sessions on September 28, 2021, and was diagnosed with adjustment disorder with anxious symptoms. She continued to exhibit paranoid behavior, often blaming the social workers and police officers for making false statements about her. She wanted to know who made the reports against her and insisted that the individuals involved be investigated. During a visit in February 2022, she demanded Alexis record the visit on his phone. She again insisted, even after the social worker and a sheriff's deputy intervened and explained she could not record the visit. During visitation, mother was at times engaging with Josiah and at other times withdrawn, sitting far away from him as he played.

Alexis interacted well with Josiah and established a parent/child bond. However, he did not seem to understand how mother's outbursts and paranoid behavior impacted Josiah.

On May 5, 2022, minor's counsel objected to the agency's recommendation to continue reunification services for mother and Alexis. Then juvenile court set a contested

12-month review hearing for June 14, 2022. The hearing was continued and conducted on August 31, 2022.

Meanwhile, the agency filed an addendum report on August 30, 2022, advising the juvenile court that mother's erratic, paranoid and harassing behavior towards the social workers involved in her case continued. She demanded a written statement explaining why Josiah had not been returned to her care. She accused the social worker of making false accusations to keep Josiah from her. She demanded to know the licensing, education, and qualifications of the social workers. She requested confidential personnel information regarding several of the social workers and said she would not have an unlicensed social worker writing her reports. She did not display physical affection toward Josiah and when she did, he avoided her and ran away or stood still. During two visits in August 2022, mother actively disassociated from Josiah and ignored him consistently throughout each visit. Josiah did not seem to mind as he continued to play on his own and narrated his play to himself.

On August 31, 2022, the juvenile court continued reunification services for mother and Alexis and set an 18-month review hearing for September 8, 2022.

*Agency Recommended Termination of Reunification Services*

In its 18-month review report filed on September 7, 2022, the agency recommended the juvenile court terminate reunification services and set a section 366.26 hearing. The parents continued to live together in San Jose. Alexis was employed and mother was a full-time student but refused to disclose the name of her program and school to the agency. She and Alexis were engaged to be married but she planned to move out of their home so that he could reunify with Josiah. Mother had not returned to counseling and was not interested in participating in reunification services. She denied having any mental health concerns. Alexis interacted well with Josiah but did not understand how mother's behavior affected Josiah.

6.

*Contested 18-Month Review Hearing*

On September 8, 2022, the parents' attorneys requested a contested hearing, which began on October 25, 2022. Alexis withdrew his request for a contested hearing and waived his right to have one. Social worker Nancy Garcia testified the agency's recommendation to terminate mother's reunification services was based on her outbursts, lack of engagement with Josiah during visitation, and unwillingness to address trauma and neglect in her past through mental health services. She did not believe mother and Josiah were bonded. The hearing was continued to November 7, 2022.

Mother testified she completed all of her court-ordered services. She and Alexis were not in a relationship and were not engaged. He planned to move out of the apartment they shared that day. She denied that she ignored Josiah and stated he sought out hugs and affection from her at every visit. Mother asked that Josiah be returned to her custody but refused to disclose where she lived, and asked if she could screen record her exchange with the juvenile court concerning her refusal. The court told her she could not record the proceedings for any purpose. Asked where she was living, mother responded, "I will keep that private. I do not feel comfortable sharing that information as of now." In answer to whether she told the agency where she was living, mother said, "No." She acknowledged she was referred for additional individual counseling, but her medical insurance would not pay for it because it was not deemed medically necessary.

Alexis testified he did not know where mother lived. He continued to live in the two-bedroom apartment they previously shared. Mother moved out four or five months before. They were not in a romantic relationship. He believed the agency would place Josiah with him under a plan of family maintenance if mother moved out. He and mother had been in a relationship for four or five years. He did not plan to resume his relationship with mother if Josiah was placed with him but did not dismiss the possibility. He never observed mother behave in a way that he thought was inappropriate.

7.

Carrie Cole, a client coordinator employed by Central Valley Youth Legal Services testified she observed interactions between parents and children as part of her responsibilities and had been doing so for 20 years. She observed a visit between Josiah and his parents via computer in April 2022. Josiah was sitting in a chair, and at one point mother sat next to him. He picked up his chair and moved it to the other side of Alexis, away from mother, and put his back to her. Out of the hour-long visit, mother interacted approximately five to 10 minutes with Josiah. Cole observed mother to be "spaced out." She was not nurturing toward Josiah and he did not seek affection from her. When mother attempted to hug him, he pushed her away. Alexis, on the other hand, was nurturing toward Josiah and Josiah hugged and kissed him before he left.

Jennifer Peterson, a supervising social worker, testified the agency was concerned about mother's lack of bond with Josiah and mental health and ability to safely parent Josiah. Peterson had not seen mother make any progress. If anything, she saw a decline. The agency's concern about Alexis was his lack of insight into the severity of mother's mental illness. Peterson denied the agency intended to provide Alexis family maintenance services.

The agency argued that returning Josiah to either parent would place him at a substantial risk of harm and that mother exceeded the maximum allowable time to reunify. The agency asked the juvenile court to set a section 366.26 hearing. Minor's counsel joined. Mother's attorney argued the agency failed to meet its burden of proving there was a detriment to returning Josiah to mother and if there were mental health issues she needed to address, the agency did not provide her suitable services to meet that need. The juvenile court continued the hearing to the following day.

*The Juvenile Court's Ruling*

Counsel completed arguments on November 8, 2022, after which the juvenile court found it would be detrimental to return Josiah to his parents and the agency provided them reasonable reunification services. The juvenile court terminated

reunification services, ordered a minimum of one supervised visit each month and granted the agency discretion to increase visitation, and set a section 366.26 hearing.

Regarding mother, the juvenile court stated,

> "I think the mental health counseling, in this case, is a very important issue, obviously. And it's an important issue because, from the very, very beginning, at the inception of this case, going back to March in 2021, when [m]other was separated from her two children, Josiah, the older of the two, and Jeremiah, there were some pretty frightening allegations, at that time, for the need for removal that really have not been addressed by any of the counseling that [m]other has participated in, particularly the ten sessions through the Christian Counseling Center that she participated in. [¶] … [¶]

> "Somewhere along the line, depending upon the evidence that's accepted, we found to be credible, [m]other regressed and has formed the opinion she has no mental health issues, even though the initial reason for the removal of Josiah from … mother, which included allegations of verbal abuse, locking out a one-year-old child for hours on end for a [m]other's attention and presence, not changing the child's diaper, finding the child outside unattended, at times, naked, not feeding the child, the child rummaging through garbage to eat when the child was hungry, mother exhibiting bizarre behaviors, speaking in bizarre manners, making delusional statements to, not just the initiating social worker, but to law enforcement and others who came on the scene. This all goes back over 20 months ago.

> "The [a]gency recognized from the very beginning—and clearly so—the mother needed to be assessed for mental health issues; and she was. When mother testified about all of the assessments she had, and she basically didn't meet criteria, therefore, she was fine[.] Mother was very defensive about all that information, including being defensive about disclosing any of her past traumas and her own psychological and emotional traumas, which included [m]other, not too many years ago, as a teenager, being removed from her own parents' care and placed in foster care and being moved, from time to time, to different placement and having a very, very difficult time in foster care and feels that is totally irrelevant. [¶] … [¶]

> "Moving on with a clear sense of what the … toddler, Josiah, feels [his] comfort level is at that young age, undisputed about what has happened in visitation by numerous accounts, including the accounts of

9.

[Cole], who observed Josiah's lack of interaction with [m]other, [m]other's lack of interaction with [the] [c]hild.

"This is not a bonding issue at this moment.… The issue in this case is, after 20 months, there are no more services to offer. And so the Court has to make a decision.… [¶] … [¶] [C]ould [Josiah] be returned to [m]other at this time[?] I conclude he cannot. It would not be in his best interest."

## DISCUSSION

*The 18-Month Review Hearing*

Recognizing the importance of permanency for children, the Legislature placed a limit on the duration of reunification services depending on the age of the child when initially removed from parental custody. For a child like Josiah who was under the age of three years when initially removed, the juvenile court may terminate reunification services as early as six months from the dispositional hearing but no later than 18 months from the date the child was originally removed from parental custody. (§ 361.5, subd. (a)(1)(B) & (a)(3)(A).) Thus, the 18-month review hearing generally marks the maximum allowable period of reunification services afforded a parent under the dependency statutes. (§ 361.5, subd. (a)(3)(A).)

At the 18-month review hearing, the juvenile court is required to return the dependent child to parental custody unless the court finds by a preponderance of the evidence that the return of the child would create a substantial risk of detriment to the child's safety, protection, or physical or emotional well-being. (§ 366.22, subd. (a)(1).) A parent's failure to participate regularly and make substantive progress in court-ordered treatment programs is prima facie evidence that return would be detrimental. (*Ibid.*) Technical compliance with court-ordered services, though significant, is not conclusive evidence a parent does not pose a risk of detriment to his or her child. It simply means there was not prima facie evidence of detriment. The court must still consider whether the parent eliminated the conditions leading to the child's removal and whether the child

10.

would be safe in parental custody. (See, e.g., *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141–1142.)

If the juvenile court finds, as it did here, that it would be detrimental to return the child to parental custody, it must set a hearing under section 366.26 to select a permanent plan (§ 366.22, subd. (a)(3)) unless the court finds an exception that authorizes it to continue reunification services beyond the 18-month review hearing. Section 366.22, subdivision (b) provides exceptions, none of which apply here, that permit the court to continue services.[5] The juvenile court may also extend the 18-month maximum period of reunification under very limited circumstances, such as when: no reunification plan was ever developed for the parent (*In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777); the court finds reasonable services were not offered (*In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1211); or the best interests of the child would be served by a continuance (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1798–1799.)

*Standard of Review*

We review the juvenile court's findings and orders for substantial evidence, resolving all conflicts in favor of the court, and indulging in all legitimate inferences to uphold the court's ruling. (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1378–1379.) Under this well-established standard, "we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the

---

[5]    Those exceptions pertain to parents who are residents of a court-ordered substance abuse treatment program; or recently discharged from incarceration, institutionalization, or the custody of the United States Department of Homeland Security; or who were a minor or nonminor dependent parent at the time of the initial hearing. The juvenile court must also find the parent is making significant and consistent progress, there is a substantial probability the child will be returned, and that it is in the child's best interest to continue services to the parent. The juvenile court may continue services up to 24 months from the date the child was initially removed from parental custody. (§ 366.22, subd. (b).)

findings of the trial court.' " (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.)

Mother bears the burden on appeal of establishing that the evidence was insufficient to support the juvenile court's findings. (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001.) And the juvenile court's order, "like any other judgment or order of a lower court, is presumed to be correct, and all intendments and presumptions are indulged to support the order on matters as to which the record is silent." (*Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 88.)

*Application*

By the 18-month review hearing, mother had received 20 months of reunification services, far more than the six to 12 months ordinarily provided for so young a child as Josiah. One of the more important services offered to mother were mental health services, given her mental state when Josiah was removed from her. However, mother did not take advantage of them. She refused to acknowledge that the trauma and neglect from her childhood affected her mental health, claiming it was irrelevant to Josiah's case. As a consequence, she apparently underreported her mental health needs and did not qualify for mental health services. While she did participate in 10 individual therapy sessions through the Christian Counseling Center, she did not continue therapy after the last session on September 28, 2021, allowing a full year to go by without any mental health treatment. Meanwhile, her erratic and paranoid behavior continued as she focused her efforts on disqualifying and blaming the social workers involved with her case rather than establish a loving bond with Josiah.

Given mother's persistent mental health symptoms and unwillingness to treat them, the juvenile court could properly find it would be detrimental to return Josiah to her custody. Further, because mother was provided reasonable reunification services, which she does not challenge, and none of the circumstances that warrant continued

12.

reunification services applies, the juvenile court had no choice but to terminate reunification services and set a section 366.26 hearing.

Regarding visitation, the juvenile court must allow the parent to visit the child unless the court finds it would be detrimental to the child. (§ 366.22, subd. (a)(3).) "[D]ependency law affords the juvenile court great discretion in deciding issues relating to parent-child visitation, which discretion we will not disturb on appeal unless the juvenile court has exceeded the bounds of reason." (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1557–1558.) Here, the juvenile court's visitation order did not change. The court ordered the agency to provide mother a minimum of one supervised visit a month at the dispositional hearing and again at the conclusion of the 18-month review hearing. The court also granted the agency discretion to increase the frequency, which it did to once weekly during the reunification period. We cannot say the juvenile court abused its discretion in ordering a minimum of one visit a month in light of its decision to terminate reunification efforts and implement a permanent plan for Josiah. Therefore, we find no error in the juvenile court's ruling.

## DISPOSITION

Mother's writ petition is denied on the merits. Her request for a stay is also denied. Because the section 366.26 hearing is set for March 2, 2023, our decision is final as to this court immediately. (Rules 8.452(i), 8.490(b)(2)(A).)

13.