Filed 4/17/23  Jerry B. v. Superior Court CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JERRY B., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF FRESNO COUNTY, <br><br> Respondent; <br><br> FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Real Party in Interest. | F085707 <br><br> (Super. Ct. Nos. 21CEJ300208-1, 21CEJ300208-2) <br><br><br> **OPINION** |

## THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Mary Dolas, Judge.

Juvenile Law Center and Olga B. Saito for Petitioner.

No appearance for Respondent.

Daniel C. Cederborg, County Counsel, and Ashley N. McGuire, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]     Before Hill, P. J., Detjen, J. and DeSantos, J.

Jerry B. (father) seeks an extraordinary writ (Cal. Rules of Court, rules 8.450–8.452) from the juvenile court's January 30, 2023, orders issued at a contested 18-month review hearing (Welf. & Inst. Code, § 366.22),[1] terminating reunification services to his now eight- and six-year-old daughters, Faith B. and Serenity B. respectively, and setting a section 366.26 hearing for May 22, 2023. Father contends substantial evidence does not support the juvenile court's findings that it would be detrimental to return the children to his custody and the Fresno County Department of Social Services (department) provided him reasonable reunification services. He requests a stay of the section 366.26 hearing. We deny the writ petition and request for a stay.

## PROCEDURAL AND FACTUAL STATEMENT

*The Referral*

Dependency proceedings were initiated on June 1, 2021, when the department responded to a referral that father sexually abused the children's stepsister, D.W., and he and the children's mother, Rebecca W. (mother),[2] were using drugs. Father was living with the children at his grandmother's house and mother was living in a hotel. Mother was legally married to Angel R.

Social worker Katrina Martinez and police officer C. Moua interviewed then 15-year-old D.W. and her maternal grandmother, D.B. D.B. said D.W. had been mainly in her care but lived with mother and father (D.W.'s stepfather) from 2015 to 2019 when she was approximately nine to 12 years old. The parents kept her locked in her bedroom and father sexually molested her. The parents were using methamphetamine and there was other drug activity, including drug sales, going on in the home. A foul odor could be detected from the front yard. D.B. recalled father took showers with Faith and when

---

[1] Statutory references are to the Welfare and Institutions Code.

[2] Mother did not seek writ review.

2.

mother said anything about it, he responded, " 'Shut up, that's my kid and I'll do what I want.' "

D.W. said father molested her from the ages of nine to 13. The molestation occurred at night and involved caressing her body over her clothes. When she was 11, he tried to penetrate her with his hand. She did not tell anyone because father said she would be taken away if she told and mother would hate her.

Martinez, Moua and several other officers conducted a welfare check of the children at the father's grandmother's home and found father seated in the front yard with Serenity and Faith who were playing barefoot in kiddie pools with dirty brown water. Old dirty toys and food items were scattered around the front yard and flies were swarming around the food. The home had a palpable odor of mildew and filth. Three adults with glossy eyes and dilated pupils exited the residence. The inside of the home was cluttered with food, clothing and trash bags. There was not a clear path to walk through the home and the home was infested with cockroaches and large worms crawling beneath the sink in the kitchen. The plumbing was not working correctly and there was a large bucket beneath the sink filled to the brim with yellow liquid. The police found a methamphetamine pipe on a low shelf in the bedroom accessible to the children and a methamphetamine water bong on a higher shelf in the same bedroom. The children were unkempt and had head lice and their sleeping areas were filthy. In addition, there was a pocketknife on one of the beds accessible to the children. The children said they always had enough to eat and denied being molested or sexually abused.

Father said he lived in the home with his grandmother, a friend, his uncle and "Boo" who lived in the backyard. He acknowledged the home was dirty but said they were being evicted. He denied using methamphetamine, was not aware of any methamphetamine in the home and did not suspect anyone in the home of using it.

Mother last saw Faith and Serenity before Thanksgiving 2020 and was not aware of any drug activity in the home. Father did not allow her to see the children unless she

spent the night with him in a motel room. She used methamphetamine on and off for 19 years and last used three to four months before.

The department took the children into protective custody and placed them in foster care. In a dependency petition filed on their behalf, the department alleged the parents' methamphetamine use, father's unsafe and unsanitary housing and mother's homelessness placed the children at risk of physical harm or illness (§ 300, subd. (b)(1) [failure to protect]) and father's sexual abuse of D.W. placed them at risk of being sexually abused. (§ 300, subd. (d) [sexual abuse]).)

*Detention*

On June 4, 2021, the juvenile court ordered the children detained pursuant to the petition, ordered weekly supervised visitation and offered the parents parenting classes, substance abuse, mental health and domestic violence evaluations and treatment, and drug testing. The jurisdiction and disposition hearing was set for July 26, 2021.

On June 21, 2021, father told social worker Chong Lee that he completed a substance abuse assessment and did not require treatment. He was staying with his two grandmothers " 'here and there.' " He understood the children were removed because the home was dirty. Mother told Chong Lee she was homeless. She knew father was using drugs but did not report it.

On July 20, 2021, the department filed a first amended petition, adding a count under section 300, subdivision (d) that mother failed to protect the children from sexual abuse by their father. It reflected mother's whereabouts were unknown and father was the presumed father of both children. It also reflected Angel R. was the presumed father of Serenity and his whereabouts were unknown.

On July 26, 2021, the juvenile court set a jurisdictional hearing on the first amended petition and settlement conference on disposition for August 30, 2021, and a jurisdictional hearing and contested dispositional hearing for September 27, 2021.

4.

*Jurisdiction and Disposition*

Minors' counsel withdrew her request for a contested hearing at the settlement conference on August 30, 2021, and the juvenile court amended the first amended petition to exclude Angel R. The court sustained the allegations and ordered the parents to complete the services previously offered, vacated the September 27, 2021, hearing and set a six-month review hearing for February 28, 2022.[3] Among the objectives of father's services plan was that he show his ability and willingness to have custody of the children.

*Reunification Efforts Through the 12-Month Review Hearing*

By the six-month review hearing, father completed a parenting program, the evaluations and tested negative for drugs. The only recommendation resulting from his evaluations was to complete the 52-week child abuse intervention program. He was scheduled for an intake appointment on February 25, 2022. He was employed as a taxi driver and living with his grandmother, which he said was a temporary arrangement until he could afford housing of his own. He was applying for Section 8 housing and expected to be approved. He consistently visited the children and worked on his relationship with them. Mother was living with her mother and D.W. She regularly visited the children and was referred for mental health treatment and child abuse intervention classes. Although she admitted struggling with alcoholism and was testing positive on her drug and alcohol screenings, she resisted inpatient substance abuse treatment.

On February 28, 2022, the juvenile court found it would be detrimental to return the children to their parents' custody and the department offered or provided them reasonable reunification services. The court continued their services to the 12-month review hearing on July 25, 2022.

---

[3]    The department did not believe there was sufficient evidence under section 361.5, subdivision (b)(6) that father severely sexually abused D.W. and did not recommend the juvenile court deny him reunification services.

Meanwhile, in May 2022, the parents began unsupervised weekend visits with father visiting the children on Saturdays and mother on Sundays. The parents participated in activities with the children and the children enjoyed visiting their parents. Mother was living with her aunt and D.W. and father lived with his grandmother and continued to look for housing. The department reported the parents continued to show progress and recommended the juvenile court continue reunification services.

On July 25, 2022, the juvenile court continued reunification efforts and set the 18-month review hearing for November 14, 2022, after finding the parents made moderate progress in completing their service plan objectives but it would be detrimental to return the children to their custody. The court also found the department provided them reasonable reunification services.

*Reunification Efforts Subsequent to the 12-Month Review Hearing*

By November 2022, neither parent had stable housing for the children. Mother had recently begun liberal visits but the children reported they had to fend for themselves while mother slept and they were already planning where they wanted to be placed if they were removed again. Father had not progressed beyond unsupervised visits. He had a roommate and he put a deposit down on an apartment but did not know the status of its availability. He wanted to have liberal visits at his aunt's home and the department attempted to clear her home for that purpose but she had not made herself available. Social worker Stefania Rodriguez stressed to the parents multiple times the importance of them finding stable housing. They assured her each month that they were working on it.

The department did not believe the children could be safely returned to their parents' custody because they lacked stable housing. Nor did the department believe there was a substantial probability the children could be returned to parental custody following an additional period of reunification and recommended the juvenile court terminate reunification services.

6.

On November 14, 2022, the juvenile court set a settlement conference for January 23, 2023, and a contested 18-month review hearing for January 30, 2023.

Meanwhile, an investigator for minors' counsel interviewed the children at their school to inquire how visits were progressing and whether they wanted to return to the custody of either parent. Faith was enjoying overnight visits with mother and felt safe with her. They played games, went out to eat and talked. Faith said she would like to spend two nights with mother. She thought mother was " 'nicer' " than she was when the dependency case started because she took the time to talk to her during visits. Asked whether she wanted to return to mother's custody, Faith said, " 'I don't know, I want to stay with aunt Gen.' " She explained aunt Gen was the lady who took care of them. Faith enjoyed visiting father and felt safe with him. She wanted additional visits, including overnight visits with him. She believed father was " 'nicer' " because he played with them more. As to whether she wanted to return to father's custody, Faith stated, " 'I don't know, I want to spend the nights with him but I want to live with aunt Gen.' "

Serenity also enjoyed visiting her parents and felt safe with them. She found them to be " 'nicer' " and more engaged with her. She wanted to return to her parents' custody and wanted to spend " 'five nights with daddy.' "

The investigator visited the caregiver at her home. The caregiver stated the children were excited to see their parents and did not exhibit any negative behavior when they returned from visiting them. She was committed to adopting the children if reunification failed.

Father's attorney told the juvenile court at the settlement conference father was fully compliant with his services but lacked housing to advance to liberal visitation and counsel did not know how to help him. Father could not have liberal visits at his home because his roommate had a history with child protective services (CPS), none of his relatives were willing to rent him a room, and he applied for Section 8 housing and was

7.

on a waiting list. His only option was emergency housing through El Puente and he believed he had a referral there until he personally checked and was told there was not a referral for him. The court confirmed that the issue at the contested hearing would be whether the department provided reasonable services with respect to housing and the progression of visits. Father's attorney said he would also argue for return of the children to father's custody with or without family maintenance services.

In an addendum report filed by the department on January 30, 2023, the department maintained its recommendations the juvenile court terminate reunification services and set a section 366.26 hearing. The department was concerned that mother was testing positive for alcohol, was discharged from substance abuse treatment and was telling the children to " 'keep secrets' " about where their visits were taking place. It was also concerned that father was given the opportunity for housing to begin liberal visits but appeared resistant to following the rules. On November 16, 2022, Rodriguez submitted a housing referral for father at El Puente but because he was not forthcoming with background information the referral was incomplete and rejected. Rodriguez resubmitted the referral and it was accepted. The shelter liaison asked Rodriguez to review the occupancy agreement with father. He was only available by telephone. On November 18, Rodriguez attempted to review the agreement with father but he interrupted her while she was reviewing the provisions regarding financial requirements, sign-in policy and care of the unit and asked if that applied since he would only be using the housing for liberal visitation. When Rodriguez told him it applied, he seemed upset and said he did not understand why he had to follow the rules. Rodriguez was unable to complete the agreement with him at that time because he was frustrated and in his car, working. On November 21, Rodriguez told the shelter liaison they were still trying to complete the housing agreement and father questioned whether the rules applied to him. The liaison said father would not be considered for shelter if he was already exhibiting an unwillingness to comply. On November 30, Rodriguez explained to father why his

application was not accepted.  He said he was only asking questions.  They completed and submitted the application and on December 1, Rodriguez was notified that father was placed on the waiting list.  That same day, Rodriguez provided father a list of housing resources for him to contact.

The department also reported that during home visits, the children appeared worried that father had no money.  They made statements like, " 'poor daddy, he has to use all his money to buy this, poor daddy he doesn't have money for a new wallet.' "  The children saved their allowance to buy father a wallet.  Serenity also shared that she got scared when father " 'yells at her.' "  Faith did not know how she felt about overnight visits with father because he did not have a place for them to sleep.

*The 18-Month Review Hearing:  January 30, 2023*

Rodriguez testified the department believed it would be detrimental to return the children to either parent.  Mother did not have stable housing for the children.  The department approved liberal visits for her with the children at the home of the maternal aunt and mother reported that was where the visits were occurring.  However, the children reported otherwise.  The department offered to clear the maternal grandmother and grandfather's homes but mother said they were not ready to be approved.  Rodriguez also offered to conduct a walkthrough of a trailer mother said she had but mother said it was not ready.  As to father, the children were removed from him because they were living in unsafe conditions, which he had not necessarily resolved.  His housing was still unstable.

Rodriguez established an objective for father that he obtain safe housing and explained the department could intervene with housing referrals when the family was ready to begin liberal or extended visits.  She attempted to clear father's aunt for liberal visitation but was unsuccessful because the aunt was not interested in offering her home for the children.  She also attempted to clear father's home, but found out at the

9.

settlement conference that his roommate had CPS history. On January 24, 2023, father told her he was no longer going to pursue the apartment at which he had placed a deposit.

During a meeting on September 22, 2022, Rodriguez agreed to submit a referral to El Puente for father as a backup plan. However, she did not submit the referral to El Puente until November 18, 2022. She did not submit it sooner because father wanted to first pursue staying with his sister. She acknowledged she had a duty to provide timely referrals for all programs necessary for reunification. However, it was not the department's policy to send referrals against a parent's wishes. In addition to El Puente, Rodriguez provided father a referral for "MAP." She estimated she provided him information about three or four programs. Asked whether she was familiar with Bringing Families Home, she said she had minimal familiarity with the program but knew they offered housing assistance. She said the referral for El Puente also covered Bringing Families Home. She did not know if father applied for Section 8 housing and did not recall whether he asked for assistance in doing so. Section 8 housing required the family to be ready to begin liberal or extended visits. The same requirement applied to referrals for El Puente.

Mother testified she was living with her mother and in the process of moving in with her aunt whose house was cleared for overnight visitation. She was employed at a convenience store. She acknowledged staying with the children in her trailer during a liberal visit and telling the children to keep it a secret from the social worker because she was scared.

Father testified the plan following the September 22, 2022, meeting was that he would have liberal visits at his sister's house. At the same time, the department would refer him to El Puente. He denied that he did not want to follow the rules there. He was just asking questions. Asked whether he asked Rodriguez if the department could help him find housing, like Section 8 housing, father thought he might have mentioned it and was told he had to do that on his own. He put a deposit on an apartment and applied to

10.

five others but was denied he believed because of his credit and rental history. Rodriguez provided him two places to call for housing but they were for homeless people, not people with children. "MAP" was one of those places. She did not provide him any other type of resources. He did not believe any of his relatives would provide temporary housing so that he could progress with visits. If the children were returned to him following the hearing, he would not have a place to take them.

The juvenile court found the department provided the parents reasonable reunification services. The court recognized the parents participated in their case plans and found they made good progress. However, neither could take the children into their custody. Therefore, the court found it would be detrimental to return the children to them. The court also found there was not a substantial probability the children could be returned to parental custody by the 24-month review hearing because there was no way of knowing whether housing would be available in weeks or months. The court terminated reunification services and set the 366.26 hearing.

### DISCUSSION

*The 18-Month Review Hearing*

Recognizing the importance of permanency for children, the Legislature placed a limit on the duration of reunification services depending on the age of the child when initially removed from parental custody. For children like Faith and Serenity, who were over the age of three when initially removed, the juvenile court may provide reunification services up to 12 months from the date the children entered foster care[4] but no later than 18 months from the date the children were originally removed from parental custody. (§ 361.5, subd. (a)(1)(A) & (a)(3)(A).) Thus, the 18-month review hearing generally

---

[4]    A child is deemed to have entered foster care either on the date of the jurisdictional hearing or 60 days after the date of the child's removal, whichever occurs first. (§ 361.49.) The children entered foster care on August 1, 2021, 60 days from June 1, 2021, the day they were taken into protective custody and before the jurisdictional hearing was conducted on August 30, 2021.

11.

marks the maximum allowable period of reunification services afforded a parent under the dependency statutes.  (§ 361.5, subd. (a)(3)(A).)

At the 18-month review hearing, the juvenile court is required to return the dependent child to parental custody unless the court finds by a preponderance of the evidence that the return of the child would create a substantial risk of detriment to the child's safety, protection, or physical or emotional well-being.  (§ 366.22, subd. (a)(1).) Although a parent's participation and progress are significant, they are not conclusive evidence a parent does not pose a risk of detriment to his or her child.  The court must still consider whether the parent eliminated the conditions leading to the child's removal and whether the child would be safe in parental custody.  (See, e.g., *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141–1142.)

If the juvenile court finds, as it did here, that it would be detrimental to return the child to parental custody, it must set a hearing under section 366.26 to select a permanent plan (§ 366.22, subd. (a)(3)) unless the court finds an exception that authorizes it to continue reunification services beyond the 18-month review hearing.  Section 366.22, subdivision (b) provides exceptions, none of which apply here, that permit the court to continue services.[5]  The juvenile court may also extend the 18-month maximum period of reunification under very limited circumstances, such as when:  no reunification plan was ever developed for the parent (*In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777); the court finds reasonable services were not offered (*In re Daniel G.* (1994) 25 Cal.App.4th 1205,

---

[5]     Those exceptions pertain to parents who are residents of a court-ordered substance abuse treatment program; or recently discharged from incarceration, institutionalization, or the custody of the United States Department of Homeland Security; or who were a minor or nonminor dependent parent at the time of the initial hearing.  The juvenile court must also find the parent is making significant and consistent progress, there is a substantial probability the child will be returned, and that it is in the child's best interest to continue services to the parent.  The juvenile court may continue services up to 24 months from the date the child was initially removed from parental custody. (§ 366.22, subd. (b).)

12.

1211); or the best interest of the child would be served by a continuance (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1798–1799).

*Standard of Review*

We review the juvenile court's findings and orders for substantial evidence, resolving all conflicts in favor of the court, and indulging in all legitimate inferences to uphold the court's ruling. (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1378–1379.) Under this standard, "we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' " (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.) Father bears the burden on appeal of establishing that the evidence was insufficient to support the juvenile court's findings. (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001.) And the juvenile court's order, "like any other judgment or order of a lower court, is presumed to be correct, and all intendments and presumptions are indulged to support the order on matters as to which the record is silent." (*Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 88.)

*Application*

The crux of father's contentions with respect to the juvenile court's detrimental return and reasonable services findings is that they were based on his inability to secure adequate housing because of poverty. He further contends the services plan ordered into effect failed to address his need for housing assistance.

*Detrimental Return*

As a preliminary matter, we conclude substantial evidence supports the juvenile court's finding it would be detrimental to return the children to father's custody based strictly on his testimony he had no place for them. Beyond that, contrary to his assertion, there is no evidence he was wrongly denied custody because his poverty prevented him

13.

from obtaining suitable housing. According to the record, he had the means to rent a room from someone he met at work. Rodriguez offered to assess his living situation and may have approved it had his roommate not had a disqualifying history. He also had the money to pay a deposit on an apartment but was denied because of his credit and rental history. None of this evidence points to poverty as a reason for father's inability to resume custody of his children and the fact remained that father did not have a suitable place to house them. Consequently, the juvenile court did not err in finding the children could not be safely returned to father's custody.

*Reasonableness of Reunification Services*

Although father's services plan required him to demonstrate his ability and willingness to have custody of the children, it did not include services to assist him in procuring housing. However, he failed to challenge this aspect of his reunification plan at the dispositional hearing or anytime afterward. A parent forfeits his right to complain about a reunification plan by consenting to its terms. (*In re Precious J.* (1996) 42 Cal.App.4th 1463, 1476.) Further, the juvenile court found at the six- and 12-month review hearings that father was provided reasonable reunification services, findings which he did not challenge on appeal. " ' "The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them.…" ' " (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416.) Therefore, it was incumbent on father and his attorney to seek guidance from the juvenile court in formulating a plan for housing. Neither did so until father's attorney sought the juvenile court's assistance at the settlement conference on January 23, 2023, a week before the 18-month review hearing. Nevertheless, inadequate housing was an issue for father that the department was attempting to help him resolve. Consequently, the question under reasonable services is whether Rodriguez, despite not being required to assist father with housing by the case plan, nevertheless made reasonable efforts to do so. We conclude that she did.

Rodriguez offered to assess the suitability of the paternal aunt and father's home for liberal visitation but the aunt ultimately was not willing to offer her home and father's roommate could not be cleared. Rodriguez also submitted multiple housing referrals to El Puente for father but he was denied first because he was not forthcoming about his background information and then because he questioned the need for him to comply with the housing agreement. Even then, Rodriguez helped him complete another application and he was placed on the waiting list.

On this record and in light of Rodriguez's attempts to help father secure adequate housing, we conclude substantial evidence supports the juvenile court's finding father was provided reasonable reunification services and its order terminating them.

## DISPOSITION

The petition for extraordinary writ is denied as is a stay of the section 366.26 hearing. This court's opinion is final forthwith as to this court pursuant to California Rules of Court, rule 8.490(b)(2)(A).